**PRIVILEGED & CONFIDENTIAL**

**INVESTIGATIVE REPORT**

**Prepared for**

Venable LLC
T&M Protection Resources, LLC

November 9, 2017



230 Park Avenue / Suite 440 / New York, NY 10169

Tel: 212.422.0000 / Fax: 212.422.3305 / www.tmprotection.com

## TABLE OF CONTENTS

I. Executive Summary ................................................................................................................. 4

II. Background ............................................................................................................................. 7

    A.  Investigative Objectives ................................................................................................ 7

    B.  Scope and Methodology .............................................................................................. 7

    C.  Interviews Conducted ................................................................................................... 8

    D.  Materials Reviewed ...................................................................................................... 9

    E.  Credibility ..................................................................................................................... 10

III. Findings ................................................................................................................................ 11

    **A. Alvin Levy** .................................................................................................................... 11

        1. Background ................................................................................................................. 11

        2. Levy engaged in a pattern of behavior between the early 1940s and the late 1980s, while employed by McDonogh, that included sexual assault, sexual advances, inappropriate touching of a sexual nature and inappropriate non-physical contact that made students uncomfortable ........................................................................................................................ 11

            a.  Levy engaged in sexually assaultive behavior with ten McDonogh students ......... 13

            b.  Levy engaged in acts of inappropriate physical contact of a sexual and non-sexual nature with McDonogh students ................................................................................ 19

            c.  Levy engaged in inappropriate non-physical conduct with numerous McDonogh students ...................................................................................................................... 21

        3. Reports received during the investigation of Levy's behavior with students ........................ 22

        4. Response to Student #12's ▮▮▮▮ report to McDonogh that Levy sexually abused him ..... 24

        5. Levy's Arrest ................................................................................................................ 31

    **B. Robert Creed** .............................................................................................................. 34

        1. Robert Creed touched the penis of and engaged in oral and anal sex with a 14-year-old male McDonogh student during the ▮▮▮▮▮▮ academic year, masturbated and engaged in repeated acts of oral sex with a 14-year-old male McDonogh student between ▮▮▮▮▮▮▮ and engaged in acts of inappropriate behavior of a sexual nature with two McDonogh high school students between ▮▮▮▮▮ ................................................................................................... 34

        2. Student #28's abuse by Creed was reported to McDonogh in ▮▮▮ .................................... 36

    **C. Robert Jarboe** ............................................................................................................. 38

1. Robert Jarboe engaged in repeated acts of sexual contact, including oral sex with one 15-year-old female McDonogh student and engaged in repeated acts of sexual contact, including oral sex and sexual intercourse, with another female McDonogh student from ███ when that student was a 15-year-old sophomore until her graduation from McDonogh in ███ .......... 38

2. There is no evidence to support a conclusion that Jarboe's sexual interactions with Students #30 and #31 were known to McDonogh. McDonogh was aware of allegations of sexual misconduct by Jarboe in 1988 and investigated those allegations ............................................... 40

**D. Dennis O'Brien** ................................................................................................................ 44

1. Between ████████ Dennis O'Brien engaged in repeated acts of sexual misconduct with a 12-14-year-old female McDonogh student that included kissing, touching of her naked breasts and pressing his body against her body while they slept together in a tent. O'Brien also engaged in sexual intercourse with this same student in ████ when she was 18 years old. Dennis O'Brien also engaged in inappropriate behavior between a teacher and a female middle school student in ████ made unwelcome comments of a sexual nature to a 12-year-old female McDonogh student in ██████ and engaged in repeated acts of sexual misconduct with that student in ██████ when she was 17 years old, including kissing, touching of her naked breasts and pressing his erect penis against her body. O'Brien also kissed another 17-year-old female McDonogh student in ████ ................................................................................................ 44

2. McDonogh was aware that O'Brien had engaged in inappropriate conduct between a teacher and student in 1980. McDonogh was aware of O'Brien's abuse of Student #35 in ████ after his separation from the School ...................................................................................................... 47

**E. Daniel Roach** ................................................................................................................... 49

1. Former McDonogh faculty member Daniel Roach engaged in repeated acts of sexual contact, including sexual intercourse and oral sex and kissing, with a 17-year-old female McDonogh student in the ████ ...................................................................................................... 49

2. One McDonogh faculty member may have been aware of Roach's inappropriate interactions with Student #36 when she was a McDonogh student. One McDonogh faculty member was aware of the relationship between Student #36 and Roach when the student was in college and McDonogh's Headmaster heard rumors about that relationship after the student's graduation from McDonogh .......................................................................................... 50

## I.    EXECUTIVE SUMMARY

T&M Protection Resources ("T&M") was retained by the law firm of Venable LLP ("Venable") to assist in its representation of McDonogh School ("McDonogh" or the "School") located in Owings Mills, Maryland.  Specifically, T&M was engaged to conduct an investigation into allegations of sexual abuse by two former members of the McDonogh faculty and administration, Alvin J. Levy ("Levy") and Robert E. Creed ("Creed").  Levy, a former faculty member and administrator, Commandant and Dean of Students, was employed fulltime by McDonogh from 1943-1986, and part-time in the development office from 1986-1992. Creed, a former Spanish and French faculty member and head of the language department was employed full time by McDonogh from 1969-1985.

This investigation stemmed from an allegation of sexual abuse[1] regarding both Levy and Creed recently brought to the attention of the School by a former McDonogh student.  To address these allegations, McDonogh determined that an outside entity with an expertise in sexual misconduct should investigate, and in November 2016, Venable retained T&M to conduct a comprehensive investigation into these allegations. In addition, McDonogh sent a letter, dated November 7, 2016, to the McDonogh community announcing the investigation. The letter informed its recipients of the allegations of past sexual misconduct by Levy and Creed and provided an email address and a telephone number for Laura Kirschstein of T&M Protection Resources so that individuals with any knowledge of any inappropriate behavior by Levy or Creed, or any other adult at McDonogh, could report such information on a confidential basis. In addition, upon learning of these allegations concerning Levy and Creed, McDonogh promptly reported these allegations to the Baltimore County Department of Social Services and authorities at the Baltimore County Police Department.

T&M's investigation took place over a period of approximately eleven months, from November 2016 until October 2017. In total, T&M interviewed 68 witnesses, including some on more than one occasion, either in person, remotely via video-conferencing (Skype) or by telephone. The witnesses interviewed included current and former McDonogh faculty, staff, and administrators, McDonogh alumni, parents of McDonogh alumni and former members of the McDonogh Board of Trustees. T&M also reviewed available McDonogh personnel, student and administrative records, a file maintained by the School's attorney, newspaper articles, court records, School yearbooks, minutes from meetings of the Board of Trustees, and various other documents.  T&M also conducted a review of internet sources for relevant information.  On July 24, 2017,

---

[1] Throughout this report the terms sexual misconduct, sexual abuse, sexual assault and unwanted touching of a sexual nature are used interchangeably. Each of these terms is meant to convey the sexual touching of intimate or private parts of the body whether by hand, mouth or both.

T&M provided an oral report to both Venable and the School[2] that included a review of the evidence collected at that juncture. The information in this Investigative Report was gathered under the applicable attorney-client doctrine regarding privileged communications and work product, and with the utmost regard for the privacy and confidentiality of the witnesses who were interviewed. To that end, and to further protect the privacy of the former students victimized and the many others who participated in this investigation, a numerical identifier refers to all witnesses except current and former faculty members and administrators who are identified by name.

Based on its examination of the evidence and applying a preponderance of the evidence standard, T&M makes the findings detailed in this Report. The evidence demonstrates that from the 1940s through the 1980s, while employed by McDonogh, Alvin Levy engaged in a pattern of behavior with twenty-two (22) male McDonogh students that included sexual assault, sexual advances, inappropriate touching of a sexual nature and inappropriate non-physical contact that made students uncomfortable. The evidence further demonstrates that Levy's sexual misconduct included touching and stroking the penises of male students, mutual masturbation, performing oral sex on male students, as well as rubbing other intimate areas of students' bodies while they slept or were awake, and kissing students on their lips as well as putting his tongue in their mouths. Levy also touched the arms, legs, buttocks and thighs of male students, encouraged students to shower and appear naked in his house and engaged in other types of behaviors that were inappropriate and made students uncomfortable.  Levy's behavior occurred in several locations including a campus dormitory and classroom, a car and his School office. However, most of the instances of sexual misconduct that were reported to T&M occurred inside his campus residence, a house where he lived alone, and which included a bedroom and guest room. The investigation revealed that Levy engaged in a pattern of conduct that was consistent over time, and that the students he victimized and the behaviors in which he engaged with them were strikingly similar. In addition, Levy was non-discriminating in his targeting of high school student leaders and athletes, boarding and day students, as well as non-scholarship and scholarship students.

The evidence supports the conclusion that Levy's misconduct was reported to William (Bill) Mules ("Mules"), Headmaster of McDonogh from 1972 through 1992, in 1986, after which Mules placed restrictions on Levy's interactions with students which included not allowing Levy to have students stay overnight at his home. This restriction does not appear to have been enforced or monitored. The evidence also supports the conclusion that in the summer of ███ after Student #13 reported Levy's abuse to law enforcement, Levy was arrested and charged with nine counts of various sexual offenses. Levy died prior to a plea or trial.

T&M gathered sufficient evidence during the course of the investigation to make a finding that former language faculty member Robert Creed, masturbated the penis of and engaged in oral and anal sex with a 14-

---

[2] Headmaster Charlie Britton, Associate Headmaster Brad Shelley and Director of Communications Nina Sinnott were all present.

year-old male McDonogh student during the ⬛⬛⬛⬛ academic year, masturbated and engaged in repeated acts of oral sex with a 14-year-old male McDonogh student between ⬛⬛⬛⬛⬛, and engaged in acts of inappropriate behavior of a sexual nature with two McDonogh high school students between 1978-1985. The evidence also supports the conclusion that after a student reported Creed's behavior to Mules, Creed was allowed to resign from his position, and that Creed was subsequently arrested and charged with several counts of sexual abuse involving the McDonogh student who reported the abuse to Mules.

Notably, allegations against other members of the McDonogh faculty were brought to T&M's attention during the course of the investigation. Such allegations ranged from firsthand accounts of sexual misconduct and boundary-crossing behaviors to isolated rumors and speculation about alleged behaviors.  Only three of those individuals are named in this Report. The other employees are not named since there is a lack of information from witnesses with firsthand knowledge as well as a paucity of corroborating evidence.  In several instances, individuals with firsthand knowledge of certain allegations either could not be identified or, if identified, did not respond to letters or emails seeking their participation in the investigation. Therefore, T&M was unable to make a finding that the inappropriate conduct alleged had occurred.

As previously noted, the evidence gathered is sufficient to support findings with regard to three former members of the McDonogh faculty, Dennis O'Brien ("O'Brien"), Robert Jarboe ("Jarboe"), and Daniel Roach ("Roach"). In particular, the evidence supports a finding that Robert Jarboe, an upper school English teacher employed by McDonogh from 1976 through 1988, engaged in repeated acts of sexual contact, including oral sex with a 15-year-old female McDonogh student during her sophomore year and engaged in repeated acts of sexual contact, including oral sex and sexual intercourse with this student's 15-year-old sister, from the time she was a sophomore in ⬛⬛ until her graduation in ⬛⬛  Though the evidence does not support a conclusion that McDonogh was aware of Jarboe's sexual abuse of these two students, documents examined by T&M during the course of the investigation demonstrate that McDonogh was aware of and investigated allegations of Jarboe's sexual misconduct with two other students in the spring of ⬛⬛

The evidence gathered during the course of the investigation also supports a finding that Dennis O'Brien, a McDonogh social studies faculty member, between 1977 and 1986, engaged in repeated acts of sexual misconduct with a 12-14-year-old female McDonogh student that included kissing, touching of her naked breasts and pressing his body against her body while they slept together in a tent, as well as engaging in sexual intercourse with this same student in ⬛⬛ when she was 18 years old.  O'Brien also engaged in inappropriate behavior between a teacher and a female middle school student in ⬛⬛ made unwelcome comments of a sexual nature to a 12-year-old female McDonogh student in ⬛⬛⬛ and engaged in repeated acts of sexual misconduct with that student in ⬛⬛⬛ when she was 17 years old, including kissing, touching of her naked breasts and pressing his erect penis against her body. The evidence also supports the conclusion that O'Brien kissed another 17-year-old female McDonogh student in ⬛⬛  Additionally, the evidence supports a finding that McDonogh was aware that O'Brien had engaged in inappropriate conduct between a

teacher and student with a female middle school student in ███ and was aware of O'Brien's abuse of one the students in ███

An examination of the evidence gathered during the course of T&M's investigation supports a finding that Daniel Roach, a McDonogh art teacher and Chair of the art department from 1980-1989, engaged in repeated acts of sexual contact, including sexual intercourse, oral sex, and kissing, in the ███ with a 17-year-old senior and that such sexual contact continued with this student until she was a junior in college. Additionally, O'Brien may have been aware of Roach's inappropriate interactions with this student when she was a McDonogh student and documents reviewed by T&M indicate that Mules heard rumors about the relationship between this student and Roach after the student's graduation from McDonogh.

## II.   BACKGROUND

### A.  Investigative Objectives

Although T&M's primary focus was to investigate the allegations of abuse committed by Levy and Creed during the time periods that they both worked and lived within the McDonogh community, T&M's mandate was broader and included examining any other reports made to T&M or McDonogh of allegations of sexual misconduct between current or former employees and students of McDonogh.[3]   The scope of the investigation also included determining if anyone within the McDonogh community had any knowledge of such misconduct, if any reports or complaints of abuse had been made to anyone in a position of authority at McDonogh, and in those instances where such reports or complaints came to the attention of someone in a position of authority, what, if any, action was taken by McDonogh.

To achieve these objectives, T&M identified and interviewed anyone alleged to have suffered such abuse, and identified those individuals associated with McDonogh at any level who may have known of the incidents of sexual abuse committed by Levy, Creed and others.  T&M also examined whether the School knew of these incidents, and if so, at what point in time the School obtained such knowledge, and whether such reports, if known, were addressed by anyone in a position of authority at McDonogh.

### B.  Scope and Methodology

T&M received cooperation from McDonogh[4] during the course of this investigation and at Venable's direction was given authority to pursue leads that could potentially shed light on any matter related to the investigation. McDonogh provided contact information for many potential witnesses, relevant personnel

---

[3] During the investigation T&M received a report of physical abuse that occurred in approximately 1959-1960 between a former faculty member and student, and during that same time period a report of sexual abuse between two students. Although T&M found the witnesses credible, the conduct does not fall within the scope of our investigation and is therefore not included in the Report.

[4] ███████████████████████████████████████████

records, documents, correspondence, minutes from the meetings of the Board of Trustees, and any other relevant evidence maintained by McDonogh.  Additionally, T&M reviewed School yearbooks from 1948 – 1988. T&M was also given access to specific documents that had been reviewed by Venable that were relevant to its inquiry, but were not considered confidential or protected by attorney-client privilege.

**C.  Interviews Conducted**

The investigation took place over a period of approximately eleven months, from November 2016 until October 2017.  In total, T&M interviewed 68 witnesses, including some on more than one occasion, either in person, remotely via video-conferencing (Skype) or by telephone. The witnesses interviewed included current and former McDonogh faculty, staff, and administrators, McDonogh alumni, parents of McDonogh alumni and former members of the McDonogh Board of Trustees. Some of these witnesses requested that their personal information be kept confidential due to the sensitive nature of the subject matter and, as previously noted, T&M has done so.  The temporal scope of sexual abuse identified during these interviews ranged from the 1940s to the late 1980s.

In addition to the former student who initially reported Levy and Creed's sexual misconduct to McDonogh, T&M identified other former students who were victimized by Levy and Creed from responses to a letter dated November 7, 2016 which was sent by McDonogh Headmaster Charles Britton to all faculty, staff, alumni, current parents, current members of the Board of Trustees and former members of the Board of Trustees for whom McDonogh had contact information. The letter informed its recipients of the allegations of past sexual misconduct by Levy and Creed and provided the email address and telephone number of Laura Kirschstein of T&M Protection Resources so that individuals with any knowledge of any inappropriate behavior by either Levy or Creed, or any other individual at McDonogh, could report such information on a confidential basis.

T&M interviewed eighteen men who self-identified as victims of sexual misconduct by Levy or who reported that Levy engaged in inappropriate sexual or physical contact with them, four men who reported that Levy engaged in inappropriate non-physical conduct with them that made them uncomfortable and four men who self-identified as victims of sexual misconduct by Creed, two of whom reported that Creed engaged in sexual acts with them and two of whom reported that Creed engaged in inappropriate non-physical conduct with them. Of these four men, three of them self-identified as victims of both Levy and Creed.

During the course of T&M's interviews, witnesses also reported their observations of Levy engaging in inappropriate physical and sexual misconduct with other students or their belief that Levy and Creed had done so based on both first and second-hand disclosures they had received from others.  T&M endeavored to reach by email or letter anyone who was identified by name as a possible victim of Levy or Creed's misconduct to ensure that the investigation was complete.  Additional potential victims and witnesses were identified from leads provided by witness interviews and from documents obtained by T&M.  In short, T&M attempted to

reach every individual who was identified as a potential victim of sexual abuse at McDonogh or was identified as an individual who may have knowledge of such abuse. However, many individuals declined to be interviewed or failed to respond to letters from T&M.

T&M also requested interviews with every former McDonogh employee who was identified as a perpetrator of sexual abuse or other inappropriate behavior against a McDonogh student.[5]

T&M also interviewed nine current and former faculty, staff and administrators at McDonogh about their knowledge of abuse.  Four of the faculty members interviewed were also former students who matriculated during Levy and Creed's tenure. In addition, T&M interviewed four former board members, including two former board chairs who were members of the Board during both Creed's and Levy's tenures at the School. Notably, T&M was unable to interview Mules, the headmaster during the majority of Levy and Creed's tenure at the School, because he declined T&M's request for an interview.[6] Additionally, multiple former faculty, staff and administrators were unresponsive to T&M's request for an interview, or declined to be interviewed by T&M.  Lastly, parents of three former students believed to possess relevant information were interviewed and other parents believed to have relevant information were also contacted.  In many cases, these parents are either deceased or were unresponsive to T&M's requests for an interview, and in some cases the victims requested that their parents not be contacted by T&M due to health and privacy concerns.  In all those cases, T&M honored their requests.

### D.  Materials Reviewed

During the course of the investigation, T&M reviewed available personnel records, documents, correspondence, minutes from the meetings of Board of Trustees, and any other relevant evidence maintained by McDonogh.  Additionally, T&M reviewed School yearbooks from 1948 – 1988.  T&M also conducted a review of internet sources for relevant information pertinent to the investigation.  The information in this report was gathered under the applicable attorney-client doctrine regarding privileged communications and

---

[5] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[6] On May 18, 2017, T&M sent Mules a written request seeking an interview as part of its investigation. By a letter dated May 30, 2017, Mules declined to participate in the investigation and stated that he left copies of his notes with McDonogh's attorney Jerry Oppel.  He further stated, "those notes, made on a (nearly) daily basis as events unfolded, are a more accurate representation of what I knew, or seemingly know, than any recollections I might gather now some 25 years later."

work product, and with particular regard for the privacy of the witnesses who were interviewed and documents reviewed.

### E.  Credibility

In order to make the factual findings detailed in this report, T&M reviewed the information provided by each witness and evaluated the credibility of their accounts utilizing various factors. Specifically, T&M examined, where possible, the consistency or inconsistency of their various accounts of events given over time, the witnesses' demeanors during their interviews conducted in person or via video conferencing, the witnesses' motives to lie, whether other corroborative or contradictory evidence existed, as well as whether the witnesses' versions of events made sense. After applying these common tests of credibility to each witness account, T&M finds the witnesses interviewed to be generally credible.

T&M found the witnesses interviewed to be cooperative, forthright and careful in their recitations of what transpired.  None of the witnesses appeared to T&M to be exaggerating or embellishing facts and all seemed genuinely concerned about being as precise as possible when answering questions regarding events that occurred many years ago. Many witnesses were quick to state that they were unable to recall specific details due to the passage of time, while others recalled with significant detail the events in question. All witnesses' recollections were tested against what they had told others with whom they had spoken in the past, as well as against written accounts, if they existed, of what had been previously reported by them. Importantly, there is nothing about the manner in which they related their accounts of inappropriate behavior that suggested they were misrepresenting their recollections, nor could T&M find evidence of any ostensible motivation for witnesses interviewed to be untruthful about their interactions.

Moreover, none of the witnesses who reported misconduct expressed any sufficient bias against McDonogh or the perpetrators such that the witnesses' credibility would be called into question. In addition, T&M learned during the investigation that only a few witnesses with whom T&M spoke had previously spoken to each other, and there was no evidence to suggest that those conversations had significant bearing on their credibility.  Furthermore, most other witnesses had never spoken to one another or to anyone about their experiences for many years. As a result, T&M found no support for a conclusion that the witnesses who reported misconduct conformed their statements or had a motive to lie.

Significantly, the consistent, repetitive and similarly detailed nature of what witnesses described about Levy's interactions with them and others provided corroboration for the behaviors and suggests, on its own, that the witnesses' accounts are credible.

### III. FINDINGS

### A. Alvin Levy

#### 1. Background

In 1943, Alvin J. Levy joined the faculty of McDonogh where he worked for fifty years before his arrest in the fall of 1992. During his tenure at the School, Levy held multiple positions, including faculty member, academic counselor in the Upper School, Head Commandant, Dean and Dean of Students. Levy retired from his position as Dean of Students at the end of the 1985-86 academic year but remained at McDonogh as a Dean of Students Emeritus, working part-time in Bowman House in the alumni office and in the development and fundraising office. Levy resided on campus in faculty housing throughout his tenure. He initially resided in a room in the Lyle dormitory building and then moved to an apartment in a campus building. In 1966, he moved to a house on campus where he resided until his arrest in 1992.

Many of the former students with whom T&M spoke described Levy as an integral part of McDonogh, someone who advanced the School and whose impact was much greater than that of a typical Commandant or Dean of Students. He was described as "Mr. McDonogh," "Joe McDonogh," someone who was an essential part of the fabric of McDonogh, a "saint" and a "figurehead" with tremendous "influence." Most former students indicated that he "ran the school," and many described Levy as being put "on a pedestal" by both students and community members, and that he was not only "part of the institution," but an "icon, a living legend." For many, he "was McDonogh," "the epitome of everything McDonogh was supposed to be," a "paragon of virtue and excellence" who was "not just a major influence at McDonogh but also in Baltimore and the social crowd." Others described his continued relationships with students after their graduation from McDonogh and noted that he had been the best man at many weddings of former students. Finally, many former students and faculty members reported that his close relationships with McDonogh students were apparent from the hundreds of individual student yearbook photos that had been "mounted and framed" on Levy's bedroom walls. Many students described to T&M that having their photograph on Levy's wall was a "badge of honor."

#### 2. Levy engaged in a pattern of behavior between the early 1940s and the late 1980s, while employed by McDonogh, that included sexual assault, sexual advances, inappropriate touching of a sexual nature and inappropriate non-physical contact that made students uncomfortable.

The evidence demonstrates that from the early 1950s through the late 1980s, while employed by McDonogh, Alvin Levy sexually assaulted or attempted to sexually assault ten students,[7] engaged in repeated

---

[7] The total number of victims of Levy's sexual misconduct includes Student #13, who was identified in the Court file T&M reviewed. On May 5, 2017, T&M sent Student #13 a written request seeking an interview as part of its investigation.

acts of inappropriate physical contact of a sexual nature with eight students and engaged in inappropriate non-physical conduct with at least four students that made students uncomfortable. This finding is based upon the interviews of individuals who reported being abused by Levy, the interviews of witnesses who provided corroborating information that an individual had been abused by Levy and, in very limited circumstances where an individual who had been identified as being abused by Levy is deceased, the interviews of individuals to whom those victims spoke at the time the acts occurred, or where a witness declined to be interviewed, police reports and court documents that identified an individual as a complainant in a criminal proceeding or action brought against Levy. The investigation revealed that Levy engaged in a pattern of behavior that was consistent over time, and that the behaviors in which he engaged over the years were strikingly similar.

The evidence revealed that Levy's behavior occurred during the school day, after school, in the evening and night, on the weekends, and during the summer or school vacations or breaks. Some former students described single incidents of abuse or inappropriate behavior, while others described repetitive behavior that spanned years. Although Levy's behavior occurred in different locations, including a student dormitory and classroom and inside his office, the majority of the abuse occurred in the living room, guest room, bedroom and kitchen at Levy's School-owned home on McDonogh's campus. In particular, former students reported Levy's behavior included the touching and stroking of male students' penises, mutual masturbation, performing oral sex on male students, as well as rubbing other intimate areas of students' bodies while they slept or were awake, and kissing students on their lips and putting his tongue in their mouths. Levy also touched the arms, legs, buttocks, chest and thighs of male students, and engaged in other types of behaviors that were inappropriate and made students uncomfortable such as stroking their faces and necks both while they were asleep and awake, and encouraging them to undress and shower at his house while staring at their naked bodies.

While some witnesses said this behavior occurred when they were alone with Levy, others reported that this behavior occurred when others were sleeping at Levy's home or inside Levy's office. While some students described tentative gestures that they rebuffed and did not view as threatening, others described serious acts of sexual abuse that they found deeply disturbing, confusing, and which caused them to suffer emotionally and academically.

Levy used his position as Dean of Students to gain the trust and confidence of students and prey upon their vulnerabilities, while also using his role as disciplinarian to instill a sense of fear in some students that if

---

Student #13 did not respond to our written request. However, Court documents obtained and reviewed by T&M indicate that between ████████ when Student #13, a ████ graduate attended McDonogh, Levy "fondled his genitals," and "performed fellatio" on him. Court records further indicate that under law enforcement's direction, Student #13 recorded a conversation with Levy in which Levy acknowledged having fondled and performed oral sex on Student #13 approximately 15 times.

they rebuffed his advances, they could be expelled from School or have their scholarship threatened.  Most significantly, Levy's position and role provided unrestricted access to male students that allowed these behaviors to occur.  Students' descriptions of the manner in which the sexual abuse unfolded included Levy's invitation for students to stay at his home rather than pay short term boarder fees when their parents fell ill or had to travel. He stocked his kitchen with teenage-friendly food and drinks, and encouraged students to spend time at his home eating and watching television, providing a place for students to "hang out," particularly those students who boarded and had no place to go other than their dorms.  Levy also afforded boarding students the opportunity to stay at his home and bypass a specific curfew check-in time on the weekends, by "checking out to Maj's." In doing so, Levy permitted students to stay out late and then sleep on his living room couch or floor, or in his guest room, affording him both access and control if they returned late or drunk. For others, being part of the "cool" group, or one of "Maj's boys," was considered an honor and a way of getting close to Levy.  Levy also instituted a position for students called the "Officer of the Day" that "required" day students to sleep on campus during their assigned officer of the day or "student in charge" slots and also required them to sleep on campus if they were given weekend duties. Many students reported to T&M that this duty meant they could stay overnight with Levy, while others said that they were required to do so. These required overnights created another entrée for Levy's advances and sexual interactions.

As a result of the information gathered during the course of the investigation, T&M is able to make several findings regarding Levy's behavior with and towards McDonogh students from 1943 to 1992. The inclusion of the information below should not be understood as minimizing Levy's actions toward other individuals who may not have come forward or who T&M was unable to identify. In addition, it is T&M's conclusion, based upon Levy's tenure at the School and the interviews of the students with whom T&M spoke, that there are additional victims of Levy's behavior.

### a.  Levy engaged in sexually assaultive behavior with ten McDonogh students.

Student #5, a ▮▮▮▮ graduate, described being sexually abused by Levy "approximately half a dozen times" during his junior and senior years. He recalled that during the fall of his junior year, when he was a 15-year-old day student, he spent the night at Levy's house due to his "officer of the day" assignment.  He stated that Levy's grooming behavior began with Levy asking him questions and making statements such as, "Are your legs sore? I bet they are, I can give you a rubdown.'" He reported that these types of general statements progressed to more personal questions like, "How's your girlfriend? Have you ever had sex? Ever think about your size? Is it large or small relative to others?" He stated that although he was unsure how this verbal interaction advanced to physical touching, these conversations ultimately led to Levy removing Student #5's underwear and masturbating him to the point of ejaculation.  He further stated that during one particular incident, Levy also instructed him, "There's an erection," "This is where it's sensitive,'" and "This is where the

13

foreskin goes while having sex." Student #5 stated that he never touched Levy but that on one occasion Levy asked, "Do you want to see what I look like?" to which the student responded, "No."  Student #5 reported this behavior continued throughout his junior and senior years. Student #5 recalled that during his senior year, and at Levy's suggestion, he and his brother stayed at Levy's home for a week because his mother was in the hospital having a hysterectomy.  Student #5 recalled that when his brother went to bed, he and Levy talked in Levy's bedroom and that conversation ultimately led "to fondling and such."  Student #5 also described that on multiple occasions after he slept overnight in Levy's guest room "He'd wake me up in the morning, have breakfast made, and he'd say, 'Time to get up,' and he'd kiss me."

Student #7, a ████ graduate, told T&M he first met Levy as a 7th grade day student and recalled that Levy called him into his office, where he said to him something like, "you know – I'm going to take you under my wing. I see you've been getting a lot of demerits and I want to make sure I get you going on the right path." Student #7 recalled that at that time, his mother had also been suffering from a serious illness and Levy's attention was exciting for him.  He said that as an upper school student, he had to fulfill his "student in charge" duties and sometimes had to stay over at the School.  He further reported that on those occasions, Levy frequently insisted that the student stay at his house. Student #7 recalled one evening during his junior year when he slept at Levy's because he had a lacrosse game the next day and said that Levy came into the guest room[8] where he was sleeping the following morning and began to massage his leg. Student #7 stated that when he asked Levy what he was doing, he responded by saying that he knew Student #7 had lacrosse practice that morning and told him how when he was a minor-league baseball player, he liked receiving rubdowns from the team trainer because they helped him heal more quickly. He reported that Levy continued rubbing his leg and then put his hand inside Student #7's underwear and touched Student #7's naked penis.  Student #7 stated that he "bucked himself out of bed" and told Levy to leave the room. He remarked, "That was the last time I spent the night at Maj's house."  When asked if he disclosed what occurred to anyone at the School, he stated, "I never told anyone at School because he was Dean of Students; who would I tell and who would believe me?" Student #7 reported that prior to the incident, he "could get away with anything," and that after the incident he was frequently called to Levy's office for disciplinary reasons and that he began getting demerits again.

Student #7 told T&M that on another occasion during his senior year, several months after Levy touched his penis, he arranged to meet his father at Levy's house on campus. Student #7 explained that when he arrived at Levy's home, Levy informed him that one of Student #7's friends had died in a car accident and then hugged him. He further reported that as Levy hugged him, he, "grabbed [his] ass, squeezed it and pulled

---

[8] Student #7 described a drawer in the nightstand between two single beds in Levy's guest room that contained small cards with the names of boys who had previously spent the night. Student #7 described hundreds of cards in the drawer, signed by students.

[the student] towards him." He stated that in response, he told Levy, "Get the fuck away from me. It's unbelievable you would try something like that now," and that Levy then denied having done anything inappropriate. Student #7 reported that he said to Levy, "There's something wrong with you," and then went to wait for his father at the bottom of Levy's driveway, but did not disclose to his father what had transpired.

Student #11, a ████ graduate, attended McDonogh from 7-12 grade, and was a day student whose abuse began as a tenth grader. Student #11 described how his relationship with Levy developed in 9th grade and began by the lure of food in Levy's home and students gathering at his home to drink soda and eat doughnuts. He further stated that he wanted to establish a relationship with Levy because "there was a cool crowd that surrounded Levy that you wanted to be a part of." Student #11 described his first inappropriate interaction with Levy occurring when he was alone in Levy's kitchen. He reported that as he was leaving, Levy pressed up against him and kissed him on the lips. He further stated that this type of conduct occurred repeatedly, "as much as twenty times," and that on each occasion the kissing involved Levy sticking his tongue down Student #11's "throat" and that the kissing lasted for "not more than ten seconds." He told T&M, "He wasn't able to get further than that. I was willing to do that much and not say anything." Student #11 also described an incident that occurred during his junior year. He stated, that after having a few beers he went to Levy's house and was sleeping on the floor in the living room surrounded by other male students. He said that Levy "sidled up against me on floor" and put his hands down his pants. Student #11 stated that he pretended he was asleep, rolled over and pushed Levy away and that he never told anyone about Levy's conduct.

Student #12, a ████ graduate and day student, described being sexually abused by Levy during all four years of high school. He reported meeting Levy when he was a freshman in high school and the progression of abuse began when he stayed with Levy while his mother and sister were away. He described how Levy initially made a "pass" at him one night by trying to kiss him, which he described as "very uncomfortable" and "made my skin crawl." Student #12 described that Levy's advances escalated when he began telling him, "it's normal for young boys and men to explore their sexuality." He recalled not understanding whether what Levy was saying was normal. He reported, "I was at an age where I was in my adolescence, so I had questions, I was curious about things, so I'm being told something that I couldn't evaluate effectively. Despite feeling uncomfortable, I wasn't really sure what to do about it." Student #12 reported Levy's comments quickly advanced to Levy touching his naked penis and culminated in Levy masturbating him to the point of ejaculation, and performing oral sex on him. Student #12 reported that these sexual interactions occurred when they were alone, happened "at least one or two times a week," and occurred either in Levy's own bedroom or guest bedroom.

Student #14, a ████ graduate, was a boarding student who stated that on his first day at McDonogh when moving in, all of the boys told him to "watch out for Maj" and said, "Maj is gonna come after you." He reported that boys would say, "Don't ever let Maj show you how to work the hot water in the shower," and commented, "That was his trick." He said that some students would "check out" from their dorm and sleep

over as well as sometimes take a shower at Levy's house. Student #14, stated, "His thing was that you'd be in the shower and he'd say, 'Do you know how to make it hot?' and then he'd stick his hands in. Stuff like that." He reported that students typically studied in their rooms at night and then went to Levy's house to eat popcorn and doughnuts, drink soda and watch television. He said Levy would sit with them in a chair and they would watch football. Student #14 described the first sexual interaction that occurred the summer before his sophomore year when he went to Levy's office to call his mother to pick him up from practice earlier than planned. Student #14 said he was wearing a cutoff shirt and shorts without underwear when he went into Levy's office to use his phone to make the call. He reported that Levy reached under his shorts and grabbed his penis, making skin-to-skin contact. When asked if Levy said anything when he did this, Student #14, replied, "No, he just looked at me with a blank expression on his face. I think he was reading me and waiting to see what I'd do." Student #14 stated that he did not remember more about his immediate reaction to what Levy had done other than that he "just got out" and that he did not cry. He further stated that he does not recall if Levy said anything to him as he left his office

Student #14 described a second interaction that occurred when he was lying in bed shirtless in his dorm room. Levy, who frequently walked through the dorms all the time for inspections, walked into his room and stated to him, "You've been working out, haven't you?" Student #14 told T&M that Levy then attempted to hold him down on the bed and reached for his "crotch."  He reported that, "I popped up and threw him against the wall and held him and said, 'Don't ever touch me again.'  Student #14 stated that in response Levy told him, 'You oughta be more polite. I can make things not so pleasant for you.' Student #14 said that after this occurred, Levy retaliated against him by calling his parents and telling them he was involved with drugs. He also reported that when his father confronted him about his reported drug abuse, Student #14 disclosed Levy's behavior to his father.  Student #14 reported that in response to his allegations, his father spoke to his father's friends who had gone to McDonogh, who told his father that Levy would not have done what Student #14 reported.  As a result, Student #14 told T&M that his father did not believe him and advised him to, "just shut up and straighten up and fly right." Student #14 stated that "from that point on, I was hypervigilant and I kept my whistle clean and I got through and got out."  Student #14 added that reporting this was a losing battle because "Levy was "bigger than life" and seen as "such a vital part of the campus," and compared him to Joe Paterno at Penn State.

Student #15, a ███ graduate, who began attending McDonogh in first grade, reported that Levy's abuse began when he was in eighth grade and occurred inside Levy's office.  Student #15 related how Levy would frequently get his attention as he was passing his office.  He further reported that once inside his office, Levy would put his hand between his legs, grab his buttocks and attempt to touch his penis while he was standing.  He reported that this behavior occurred "close to a hundred" times and that it sometimes occurred when there were others in the room.  Student #15 recalled hearing many warnings to avoid going behind Levy's desk.  Student #15 also stated that Levy put candy on his desk, and that he believed this act was a "subtle" way

16

to get students closer to his desk and positioned for Levy to touch them.  Student #15 also described how Levy behaved towards him during his senior year.  He recalled sleeping over at Levy's house and being awakened in the middle of the night on several occasions to Levy sitting on his bed and rubbing his face, and touching his face or shoulder.

Student #16, a ▮▮▮ scholarship and boarding student, recalled that McDonogh locked the doors to the dormitories around 9 or 10 p.m. and that students who wanted to stay out later than this would sign out to Levy's house. He further explained that students "would camp out all over the floors" and that there was a guest bedroom with two beds, that were often occupied by seniors. He described it as "a badge of honor to get a bed at Maj's house" and said the rule at Levy's house was to return "by midnight-ish." Student #16 explained that Levy had a list of all of the boys who had signed out to his house and would check to make sure they had arrived. Student #16 related that on any given night there might be as many as twenty to thirty boys who would sleep at Levy's house. He recalled that during his junior year, after having several beers, he went back to Levy's house and fell asleep. He said that when he woke up in the middle of the night to use the bathroom, he became dizzy and fell against the shower curtain, pulling down the shower rod that then hit him on his head. Student #16 said the noise woke Levy up and he got the student an icepack and put it on his head. Student #16 reported that Levy then began to ask him about what had happened and that he "was trying to be a little obtuse because I didn't want to get expelled for drinking," which he said was clearly within Levy's rights as a high-level administrator. Student #16 described lying down on the couch with Levy holding the icepack to his forehead and said that Levy "slowly started to move his hand" lower on his body, touching him first on the chest. He said Levy then "essentially moved his hand into my pants against my genitals and touched my genitals" and stated, "I was like – I was paralyzed with fear." He said that the touching did not last for a long time and that he believes he may have pretended he was asleep. Student #16 stated, "I remember being terrified and he said to me at the end, he said, 'I need you to come to my office on Monday morning,'" and continued, "I was like, 'Holy shit. I could – I'm gonna get expelled.'" Student #16 said that when he went to Levy's office the following Monday morning, he [Student #16] "did most of the talking because I was scared to death." He said that Levy said something to the effect of, "Let's not talk about this," and that Student #16 did not tell his parents Levy touched his genitals because he was afraid that if he reported Levy, he could be expelled for drinking and his scholarship was at risk.

Student #3, ▮▮▮ graduate, told T&M that in ▮▮▮ or ▮▮▮ when he was 15 or 16 years old, he was sexually assaulted in the McDonogh barracks by an intruder.[9] He stated that he confided in Levy that he had

---

[9] In the winter of ▮▮▮▮▮▮ Student #3 reported that he was sleeping in the barracks and was awakened at knifepoint by an intruder who "performed fellatio" on him. After reporting the incident to Headmaster Robert Lamborn, and disclosing the abuse to Levy, the police were informed, an arrest was made and according to Student #3, he and the other students testified in court.

been assaulted and that Levy "quickly took me under his wing and said he would protect me, that I had nothing to fear as long as he was around." Student #3 reported that one evening when he was taking his usual evening walk around campus, he spotted Levy heading towards him and that when they met, "[Levy] put his arm around him which made him feel uncomfortable, said he wanted to talk to him and drew him towards a darkened building housing the classrooms." He stated, "All the lights were out, but the Major unlocked one of the classrooms and told me to get inside, turned the light on, then drew the blinds and ordered me to sit down at one of the desks and be quiet." Student #3 recalled that when he asked him why they were there, Levy told him he wanted to comfort him, "to be a father figure." Student #3 stated that Levy touched his knee and told him that "he was only there to help [the student], to show [him] that not all men were bad, that he loved [the student] and thought I had a great future ahead of [him]. He said he wanted to be an integral part of that future." Student #3 continued that Levy told him "he was at the school to love us and to assure us that he was at the school to protect us from what he called "the bad men who would harm you,"  and that Levy apologized to him for what had occurred in the barracks and said things to the effect of "All men aren't like that," "Some men can be quite loving," and "Have you ever considered loving a man who was older than you?" Student #3 said Levy then laid his other hand on his knee, drew close to him and asked him to kiss him. When Student #3 recoiled and said he wanted to leave, Levy grabbed him sand said:  "You know, G.I., I want you to know that you can love me, that I will always take care of you," and told him that, "he was in the same league as such historical figures as the Emperor Caligula, Alexander the Great, Shakespeare, Michelangelo, and Oscar Wilde... all of them older men who loved much younger boys who looked upon them as gods." Student #3 told T&M that, "Levy then grabbed my crotch and tried to unbutton or unzip my pants."  He further stated that, "I angrily pushed him back to the floor and yelled that I would kill him if he touched me again."  Student #3 related that when he told Levy that he would report him to the Headmaster, Levy replied that he was still a Major in the U.S. Army with a clean record and that no one would believe him.  Student #3 stated that he did not report what happened to anyone at McDonogh, fearing retribution, and that from that point on until he graduated from McDonogh, Levy left him alone.

Student #4, a ████ McDonogh graduate, disclosed to three former students that Levy had sexually abused him.  Student #25, Student #4's brother, reported that during his brother's junior year his brother reported to him that his brother was alone with Levy in Levy's apartment and Levy "ended up opening his zipper and fondling him."  He further stated, "I don't know what happened. It didn't sound like oral sex or anything but it looked like he played with my brother's genitals and my brother was dumbfounded and didn't know what to do." Student #25 reported that shortly after this incident occurred, his brother told him about it and that Levy had "queered him."  Students #25 stated that the only time he saw Levy after graduation was at his 25th reunion dinner. He said that Levy was there "schmoozing around with everyone" and stated that he approached Levy and told him, "I still think about what you did to my brother," and that Levy replied by saying something like, "I'm really sorry. That was a long time ago. I want to let things die down." Student #26 reported

that Student #4 told him that Levy had "stuck his hand in my pants" and that in response Student #4 told Levy to "get his hands off," which he said Levy did. Student #27 corroborated both student accounts and told T&M that Student #4 told him that he was in Levy's apartment located in the Lyle building, and that Levy "put his hand on his crotch." Student #4 also told him that in response he pushed Levy away from him and made it clear that wasn't going to happen again. He further stated that Student #4 tried to act like nothing happened but that "[he] was the wrong person for him to do this to because he was very vocal about it." Student #27 reported that he believed Student #4 because there was "no reason for him not" to tell the truth.

### b. Levy engaged in acts of inappropriate physical contact of a sexual and non-sexual nature with McDonogh students.

The credible evidence gathered during the course of the investigation also supports a finding that Levy engaged in inappropriate physical contact of a sexual nature with eight McDonogh students. Numerous former students told T&M that while sleeping overnight at Levy's house, they would often wake up in the middle of the night to Levy "stroking" or "rubbing" various parts of their bodies. Student #21, who attended McDonogh as a boarding student from ▇▇▇▇▇▇▇▇ recalled being awakened in the middle of the night every time he slept at Levy's, to find Levy on one knee stroking his ears, the back of his shirt and back, his chin, chest and face while staring at him with his "big blue eyes." In describing Levy's physical contact, he stated, "it was very sexual." He further explained that "when you're fifteen years old and often wake up aroused, and maybe have a wet dream, it was creepy and disturbing."

Student #10, a ▇▇▇ graduate, recalled once waking up in the middle of the night to find Levy sitting on his bed stroking his leg and placing his hand on his inner thigh. Student #10 told T&M that he "jumped up and threatened him" and that Levy stopped touching him. Student #6, a ▇▇▇ graduate, described a similar incident where he woke up to Levy "rubbing" his leg and said that after this occurred, he never stayed at Levy's house again. Student #19, who attended McDonogh from ▇▇▇▇▇▇▇▇ told T&M that Levy began touching and rubbing his body sometime during his sophomore year and that it continued through his junior year. He recalled one occasion on which he had fallen asleep at Levy's house and woke up to Levy "trying to hug" him. He also recalled additional occasions when Levy rubbed his neck and shoulders and told T&M that he remembered "trying to stop" Levy from what he felt "might be an attempt" to touch his genitals.

Most former students said that Levy's office was a popular place for students to congregate. Student #6 told T&M that Levy's office "always had candy. It was a place to gather, and boys would visit every day." He recalled that students would "stop in Levy's office on their way to lunch," and that everyone "would just all talk to him." Student #11 reported to T&M that Levy "affirmed" that there was a "cool crowd" and being in Levy's office "made you part of the 'in group,'" and explained that 'being part of that group that went into Maj's office before lunch just affirmed the cool, it was a good thing." Student #21 reported that stopping at Levy's office was a ritual and that students would continuously stop there for candy. He also reported to T&M

19

that Levy kept a jar of candy on his desk and said that when a student stepped behind the desk to retrieve a piece of candy, Levy would put his hand on their buttocks. He reported that he both observed Levy doing this to others and experienced it himself. Student #21 also reported to T&M that when students were visiting him in his office, Levy "would occasionally try to slip his fingers into the crack of the ass" and that his knowledge of Levy's behavior was also a result of personal observation and his own experience.  He further explained, "You knew he was trying to slip a finger in there, and sometimes he would go up the leg, try to touch your testicles or penis, but it was like an invitation, 'There could be more of this,' like he was saying, 'Hey, good job boy.'" Student #21 also explained that the boys who were in the office with Levy were often officers of the class and that Levy would "put an arm around their shoulder," which demonstrated to him that the boys who slipped behind Levy's desk had elevated status and that the relationship was of a sexual nature.

Other students described a "dance" that would occur in Levy's office.  Student #10 reported to T&M that "early on, from right at the beginning," he "always felt really strange about him because he was very touchy." He stated that when he would go to Levy's office to figure out how to handle his demerits, Levy "was always trying to rub his hands on you. It was really weird. It bothered me from the beginning." Student #10 described that he would "be moving all over his office as he was moving around trying to touch me," and that he "remember[s] doing the dance. He'd come up and rub my shoulders and I'd step away and he'd step toward me. Very uncomfortable." Student #10 also described that "when you'd go in his office – and so many kids talked about this – how he'd come up and he'd rub your shoulders, was very touchy, and he'd always try to slide his hand down on your chest." Student #10 also reported that Levy touching students in his office "was a common conversation" and that people would always ask, "Did Maj try to feel you up today?"

Student #8, a ▮▮▮ graduate, told T&M it was known that Levy "liked to touch people," and that "sort of the price you paid was letting Maj give you a backrub." Student #8 further recalled a time when Levy "did this shoulder thing and I just clearly said, 'It aint gonna happen.'" He recalled that "it struck him as weird" making it clear to Levy that he "didn't want that."  Student #22, a ▮▮▮ graduate, described Levy putting his hand on the "nape of your neck," and then letting it linger "a couple of seconds too long," and Student #23, a ▮▮▮ graduate, told T&M "He liked to put his hand on top of your shoulder and I'd let him do that for two or three seconds and then I'd move away or push his arm off." Student #20, a student during the ▮▮▮ to ▮▮▮ academic year, said that while at Levy's house watching television one evening during his freshman year, Levy placed his hand on his thigh, "close to my privates in a way to obviously make me feel uncomfortable." Student #24, a ▮▮▮ graduate, told T&M that Levy would continuously touch him on his shoulders, arms and back.

c.    **Levy engaged in inappropriate non-physical conduct with numerous McDonogh students.**

In addition to findings regarding Levy's inappropriate physical contact of a sexual and non-sexual nature, the evidence gathered during the course of the investigation supports a finding that Levy also engaged in inappropriate non-physical conduct with many McDonogh students that made them uncomfortable.

Many former students told T&M that it was customary for students to shower at Levy's house when they were spending the night and multiple students recalled hearing warnings regarding showering there. Student #14 remembered that when he started at McDonogh, students warned him "Don't ever let Maj show you how to work the hot water in the shower," and explained to T&M, "that was his trick." He reported that Levy's "thing was that you'd be in the shower and he'd say, 'Do you know how to make it hot?' and then he'd stick his hands in." Stuff like that."   In general, many students who spoke with T&M described that "conventional wisdom" was to keep the bathroom door at Levy's house locked and described Levy as having a "habit of walking in" while the students were showering at Levy's house, looking at their naked bodies, offering to provide help in the form of soap or a towel, or asking them if they wanted to see how to work the shower massager.

Student #15 recalled the specific warning he received from an upperclassman about showering at Levy's house his freshman year.  He related that the upperclassman told him, "Here's what's going to happen. You're going to take a shower, he's going to put his hand in there and say that you need help with the soap, and you're going to push his hand out and say, 'Get out now.'" Student #9, a ███ raduate, reported to T&M, "If you took a shower and didn't lock the door, he would come in and say '[ student's name], can I get you anything, soap?'"

Student #7 told T&M that on one occasion while staying at Levy's house, Levy suggested that he use the shower massager in Levy's bathroom prior to going to bed and that Levy insisted on showing him how to use it. He explained that when he went into the bathroom Levy said, "Don't be shy, it's like a locker room," at which point Student #7 undressed. This student said that at that point, Levy was "standing in the bathroom and just staring at [him]" before he left. Student #7 also recalled that a few minutes later, Levy reentered the bathroom, "whip[ped] the shower curtain opened" and asked him, "Is everything okay?"

Student #18, a ███ graduate, also reported that when he showered at Levy's house, Levy constantly asked whether he needed a towel and came into the bathroom as the student showered to "check him out." Many students told T&M that Levy referred to his home as a "locker room" and encouraged students to walk around naked.  Student #15 told T&M that he remembered Levy telling him and other students, "This is just like a locker room, boys. You can feel free to walk around naked all you want." Student #15 reported that Levy always said, "'You don't have to wear a towel or blanket," and many former students reported Levy encouraging them to undress if they came to his house after a "muddy football game" or if it was a wet or cold day outside.

21

In addition to reports of Levy's intrusion upon students showering at his home, Student #17, a ▮▮▮▮ graduate, described Levy coming into the dorm showers on several occasions. He further explained that the dorm showers had no curtains and therefore the students were in plain view of Levy. He recalled hearing Levy tell the boys who were concerned about his presence, "We're all men here, go ahead, take off your clothes."

Finally, Student #1, a ▮▮▮▮ graduate, shared with T&M an incident that occurred when he returned to campus with Levy and three other faculty members after a sports match. He recalled that Levy began walking him to his dorm room and then suggested that rather than waking up his roommates, he should stay in Levy's room. Student #1 stated that he and Levy slept together in what he described as Levy's "small bed" in only their underwear because Student #1 did not have his pajamas. Student #1 recalled that while getting into bed Levy told him "what a nice body" he had which made the student very uncomfortable.

3.   **Reports received during the investigation of Levy's behavior with students.**

Although a number of former students with whom T&M spoke indicated that they reported Levy's inappropriate and/or sexual misconduct to McDonogh faculty members or administrators prior to 1986, T&M was unable to substantiate such reports or determine whether anyone in the administration was notified that a report had been made. Nonetheless, these students accounts, as detailed below, have been included in this Report to demonstrate the full scope of information learned during the investigation about reports to McDonogh.

Current McDonogh faculty member ▮▮▮▮▮▮▮▮▮▮▮▮▮ who graduated from McDonogh in ▮▮▮▮, reported to T&M that while he and his brother were students at McDonogh, they would occasionally go to Levy's house and that it "got to the point where we wouldn't go over there unless we were together, because we just felt uncomfortable." He said that he and his brother both felt that Levy was too "touchy" and that Levy put his hand on ▮▮▮▮ s body in a way that made him uncomfortable. He said, "He might just put a hand on your back, but when you went over there, as a guy, you felt uncomfortable." He further described that "a lot of people said the same thing, and would go to Levy's as a group but not by themselves either." ▮▮▮▮ explained that a "couple times" between his sophomore and senior years, he disclosed this information to his father, then a faculty member at McDonogh, but that his father responded by stating that Levy was only acting in a "fatherly" way and that his sons should only go to Levy's together if that made them more comfortable. None of the files examined by T&M or other evidence gathered during the investigation support a conclusion that ▮▮▮▮ s father reported the information provided by his son to anyone else at McDonogh.[10] In addition, ▮▮▮▮ told T&M that when he returned to McDonogh as a teacher, he did not discuss his interactions with or the feelings he had toward Levy when he was a student with anyone in a position of authority at McDonogh.

10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮

22

He further reported that during his tenure as a faculty member, he believed that Levy was engaging in similar behavior, such as students gathering at his home.

Student #17 told T&M that he told a faculty member in the presence of other students[11] more generally about his discomfort with students sleeping and showering at Levy's house as well as other interactions Levy had with students. Specifically, Student #17 provided an account of comments he recalled making to administrator ███████████ in the presence of other students during the late ████ This former student told T&M he told ████████ that students felt "uncomfortable" that they were only allowed to "check out" to Levy's house and that he felt weird "that some boys are sleeping in his bedroom." According to Student #17, he also told ███████ that he was uncomfortable with Levy's attitude towards "showers," and that he may have used the word "gay" in the conversation. Student #17 said that ███████ responded, "Ok, I can understand why you would be uncomfortable, I don't think Maj meant anything by it." He then recalled that ████████ "acknowledged our feelings but didn't think he crossed any boundaries." ████████ recollection of the substance of the conversation with Student #17 about Levy does not comport with the student's recollection, particularly with regard to a report about students sleeping in Levy's bed. Indeed, ████████ had only a vague recollection that students described feeling "embarrassed" because they needed to yell to Levy for a towel after showering at his home, but he was unable to recall anything more. As a result of the lack of corroboration of the details provided by this former student and the former faculty member to whom he allegedly reported this information having no recollection of such a meeting, T&M could not rely solely on this student's recollection of this conversation to make a finding that this faculty member was made aware of Levy's conduct and failed to take any action.

In addition, T&M learned about two ostensible "reports" of sexual abuse that were made by students to faculty members or an administrator during Levy's tenure, neither of which could be sufficiently corroborated to conclude that the School was aware of the sexual misconduct in which Levy was engaging. One of these reports could not be adequately investigated because the student refused to disclose the name of the person in whom he confided this information. As a result, the veracity of this report could not be tested. Specifically, Student #7 told T&M that he reported to an unidentified teacher that he had been sexually abused by Levy. Student #7 stated he specifically told the unidentified teacher that Levy massaged his leg, touched his naked penis, squeezed his buttocks and stared at his naked body after encouraging him to undress and shower at Levy's house. Student #7 could not recall whether he told this teacher prior to or after having graduated from McDonogh. He also reported that the teacher "was not shocked" and that he believed the unidentified teacher did not inform anyone "because he was sure he would have lost his job instead of Maj." T&M was unable to determine whether this faculty member did in fact report the abuse to the administration because Student #7 would not disclose his identity to T&M. Moreover, during the course of this investigation T&M

---

[11] Student #17 identified four former students who may have been present for this conversation. Two of these individuals who responded to T&M's request for an interview had no recollection of a conversation with ████████

found no record of such report and no other witness reported that any faculty member shared the information with them.

The second report was allegedly made by Student #4 to John Savage ("Savage"), a former faculty member, both of whom are deceased. Although Student #27 recalled being present when this conversation occurred between Student #4 and Savage, the evidence is insufficient to support a finding that this report was actually made based upon the lack of detail provided by Student #27 and corroboration required to determine the circumstances of this disclosure, the specific information shared with the former faculty member and precise language used during the discussion.

Student #27 reported being present for a conversation that occurred between Student #4 and Savage in which Student #4 stated that Levy "put his hand on [Student #4's] "crotch" He further reported that in response to Student #4's disclosure, "Savage's eyes welled up like he was going to cry, and made a comment that he had suspicions" about Levy and wasn't surprised by it, and said "I was afraid of this." Based upon a review of Savage's and Student #4's School files, there is no evidence to conclude that this report was conveyed to the McDonogh administration. However, Student #26 described a conversation that occurred with Student #4 shortly thereafter in which Student #4 told Student #26 that Levy approached him and "tried to get him to shut up and he was not going to." He elaborated and stated that Student #4 reported to him that Savage said "Okay, let me take care of this. Let me see what I can do," and that Savage then went and spoke with Levy about the allegation. He further explained that Student #4 told him that when Savage and Levy met, Levy told Savage that there had been a misunderstanding and that he would talk to Student #4 directly about it. Student #26 explained that about six to eight rising juniors at McDonogh were awarded junior officer positions and that soon after this meeting Student #4 was made a corporal for his class. He said this led him to ask Student #4 how he earned this position and that Student #4 told him that Levy had tried to bribe him into not speaking about the incident by awarding him the position. Student #26 reported that Student #4 told him that despite taking the position he was not going to "shut up" as Levy had wanted him to. Student #26 also reported that he spoke to his own father about the incident and that before he could finish recounting what had occurred, his father cut him off and said, "Maj? I don't believe it," and asked his son not to say anything more about it.

### 4. Response to Student #12's 1986 report to McDonogh that Levy sexually abused him.

The evidence supports the conclusion that on August 18, 1986, McDonogh learned of an allegation that Levy sexually abused Student #12 and that Student #12's disclosure was the first formal report that was made to the administration.[12] Due to the fact that Mules declined to be interviewed, information learned about

---

[12] In a handwritten note by Mules, dated August 20, 1986, he wrote that he received a telephone call from an unidentified woman in April or May who said that she was "prompted to call [Mules] (at home, at about 6 P.M.) when she opened her mail and found the McDonogh Magazine featuring Al Levy on the cover." The note further indicates that the caller said that she was "so angry that she had to call [Mules]," that she had thrown the magazine in the trash, and that her anger stemmed from the fact that her husband had been abused by Levy while a McDonogh "boy." The note indicates that the

the circumstances under which Mules became aware of the allegation against Levy, who made the allegation and Mules' response to the allegation is based almost entirely upon T&M's examination of a file kept by the School's attorney which included documents contemporaneously created by Mules as information came to his attention. T&M learned that in response to Student #12's complaint, Mules requested that Levy be evaluated by a psychiatrist, subsequently met with a psychiatrist paid for by the School, and Levy was directed by Mules not to have students spend the night alone at his house.  The evidence demonstrates that although the School imposed certain conditions on Levy at that time, Levy was not monitored by anyone at McDonogh to ensure compliance with those conditions and Levy did not abide by them. Indeed, Levy continued working on McDonogh's campus with, for the most part, unrestricted access to its students, during which time he made a sexual advance towards Student #19. Moreover, the information related to Student #12's 1986 complaint against Levy and the School's response to that information was only shared at the time with the Board Chair and previous Board Chairs, and was never disseminated to additional board members or School administrators. In addition, there is no evidence to suggest that the specific information learned was ever communicated by Mules or anyone else in the McDonogh administration to ▮▮▮▮▮▮▮▮▮▮ Mules' successor in 1992, or to law enforcement. As a result, Levy remained living and working on McDonogh's campus until his arrest in September of 1992.

Specifically, the evidence from Student #12 as well as corroborating documents provided by Venable and obtained from McDonogh's former attorney, Jerry Oppel ("Oppel"), and McDonogh ▮▮▮▮▮▮▮ ▮▮ ▮▮▮▮▮▮▮▮▮▮, indicate that several years after he graduated from McDonogh, Student #12 disclosed the abuse to his parents, after which he returned to campus and confronted Levy in his office, telling him "I know now what you did to me, and I'm here to tell you that was not okay, and I'm letting you know that I'm letting the headmaster know." Student #12 subsequently met with Mules and explicitly told him that Levy sexually abused him, including the time period over which the abuse occurred and the specific sexual acts in which Levy engaged.  Student #12 also confided in Mules his concerns about disclosing what occurred publicly and discussed "how to keep it quiet." He told T&M, "I definitely did not want him to take some big action that would expose me for having opened this up publicly. And so he got very concerned, both for me and my parents and our family, and very sad that it had taken place."

Student #12 also related that Mules indicated to him that there had been "some concern with Al Levy as well, but they couldn't - they didn't have enough information to do anything about it." He said that he believed Mules told him that in the period since he graduated, the School "had put in some things to make it more difficult for students to go to faculty houses." A review of a handwritten document prepared by Mules,

---

call ended abruptly when the caller's husband drove into her driveway and that "because [Mules] could not verify this call or identify the caller [he] took no action."

dated August 18, 1986, corroborates Student #12's account regarding his disclosure to Mules. It states in pertinent part:

> He told me that during his four years at McDonogh that Al Levy had regularly sexually molested him. There was a long pause and then [Student #12] began to describe what had happened. He reported that regularly Al would "manipulate" him into spending the night at Al's house- alone. That there would be an opportunity arranged by Al with care when he (Al) would enter the guest bedroom and would 'touch' [student]. The events were, [Student #12] says, limited to fondling – hands on [Student #12's] genitals. The events were always located at Al's house, always when only the two of them were there, mostly at night, although there was one time when it happened during a daytime visit to the house.

Upon receipt of these allegations by Student #12, Mules took a number of steps, memorialized in a series of handwritten notes examined by T&M, that included speaking to ███████████, prior Board Chairs Joe Keelty, Bill Middleton, Tom Peddy and Al Dudley, and Oppel and meeting with Levy. In a handwritten document dated August 20, 1986, Mules indicated that in his meeting with Levy, Levy denied the allegations and accused Student #12 and his family of having made up the allegations for financial gain. The memo also indicates that Levy "suggested the possibility of his moving off campus – if [Mules] felt that was necessary and that Mules responded that "we needed to hold off – maybe that would develop as an appropriate measure" after which Mules and Levy "agreed" to the following four "protective" measures:

> 1) That no students will spend the night alone with Al at his house;
> 2) That after Al's upcoming trip no students will spend the night at Al's house;
> 3) That Al will do all he can to eliminate any appearance - any circumstance which may be interpreted as 'compromising';
> 4) That Al will see a psychiatrist – and will describe this situation - what he says is a false accusation - and about which I don't know…..that is, I don't know what the truth is. I will locate an appropriate person and tell Al.

Mules' handwritten notes of his interactions with ███████████████, dated August 21, 1986, indicate that he met with ██████ that day and updated him about what had occurred over the preceding few days relative to Student #12's allegation and that "[they] agreed that the first responsibility is to eliminate – if possible – any chance that any future misconduct takes place." Mules also wrote, "I told ████ that though I had no proof, I strongly suspected that [Student #12] was telling the truth." Mules continued, "I told him that I would be speaking w/Dr. Fred Berlin of Johns Hopkins, a specialist in such disorders."[13] The note further

---

[13] According to publicly available information, Fred Berlin, M.D. founded The Johns Hopkins Sexual Disorders Clinic in 1980, and has been involved in the evaluation and treatment of adults and adolescents with psychosexual disorders as well as the treatment of sex abuse victims since the early 1980s.

indicates that Mules reported to ▮▮▮▮▮ that his interactions with Levy in the last few days had "increased [his] belief that [Student #12's] claim is valid." Moreover, Mules' handwritten notes, dated August 27, 1986, indicate that Mules had a conversation with Student #12's psychiatrist during which the psychiatrist said he was "convinced that [Student #12] is telling the truth."

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ recalled that Mules spoke to him regarding the various steps he was taking in response to Student #12's allegations. ▮▮▮▮▮ reported that Mules received advice from a "law firm for him to go to a psychiatrist for counseling," and that the attorney informed Mules that the incident reported by Student #12 was "not a reportable incident by law at [that] time." Notably, a handwritten memorandum dated, August 26, states that Mules met with Oppel, after Student #12's disclosure to him. The memorandum notes that Oppel recommended Mules be kept informed and receive "confirmation" of Levy's "ongoing counseling," but does not include any notation about whether the information learned from Student #12 would be or had to be reported to law enforcement. Notably, Mules indicates that Oppel agreed with his suggestions about trying to have Levy moved off campus and "resign from the board." Additionally, Mules indicated, "[Oppel] does worry that if there is a reason for concern – and there is a further incident – we would then be vulnerable."

Documents provided to T&M indicate that Mules facilitated an initial meeting between Levy and Berlin for an evaluation and subsequent therapy sessions.  T&M reviewed an invoice from Johns Hopkins University requesting payment for three visits by Levy to Berlin between September 9, 1986 and November 11, 1986, including a comprehensive evaluation, a twenty-five-minute psychotherapy session, and a "follow-up" consultation.  A handwritten memorandum, dated November 11, 1986, authored by Mules indicates that Berlin called him that day to report that although he met with Levy several times, "little progress is being made," that Levy "continues to deny that he did anything wrong," that he "can't be of much help," and to suggest that "the possibility of a contact by [Student #12's] doctor" may help Levy to understand his conduct. There was no evidence gathered to support a conclusion that any additional counseling was rendered and paid for by McDonogh, or that Berlin provided any official reports on Levy's progress to Mules.

The evidence further indicates that Mules had at least one conversation with Levy that suggests Levy continued to allow students to spend the night at his home in violation of their understanding.  A handwritten note from Mules to Levy, dated February 7, 1987, indicates that Mules learned Levy had continued his practice of having students sleep at his home.  The note states:

> Lest there be any further variance in our understandings of this matter, I am using this note to repeat our conversation of earlier this week. We agree that students are not to spend the night, any night, at your house – either alone

or in groups. I had believed that we were operating under such a guideline since your return from Africa in the fall but, apparently, that was not the case. It is the best interest of all- especially you- that the restriction be completely adhered to. You are welcome to tell students whatever you wish when they ask to stay at your house. I can assure you that doing so (That is, saying "no") serves all parties. I have told ▨▨▨▨▨▨ and Bill Seal[14] that we will not accept "checking out to Maj's" as a valid destination any longer. With the expectation that there will be no further variance between our understandings, I need not add any cautions. If. However, we do not remain in concert on this matter, I will need to bring this matter to your attention in a direct and forceful manner. I certainly don't expect that to be necessary. I will speak with you shortly to confirm your receipt and your understanding of this note. - Bill

Mules' additional concerns regarding students spending time at Levy's home alone and not sleeping over were documented in a handwritten memorandum, dated Sept 22, 1989 after learning that at a picnic Levy invited a student to study at his home during the day. Mules' notes indicate that he became aware of this from a conversation he had with parents of Student #29 on September 21, 1989. Student #29's parents told Mules that since the beginning of "year's start" Levy had invited their son to study at Levy's home. The memorandum states in pertinent part:

> The next morning I spoke with Al Levy- and expressed my concern. I cited my worry that an incident might arise that would force me to take action- in light of the allegations made by [Student #12] over two years ago. I noted to Al that merely an accusation (of him) would be sufficient to come to a conclusion – the result of which would leave the remainder of Al's life in ruins. Al states that he understood my warning – it was obvious to me that he tried to change the subject.

▨▨▨▨▨▨ reported that after learning of Student #12's complaint, they restricted students from visiting Levy's home and his house near the campus chapel was "off limits to students" and that "any visitation to Al Levy's house stopped." When asked if he and Mules discussed communicating the incident to the School, ▨▨▨▨▨▨ said, "We at the time, not having the accuser, decided not to communicate it to the school or the board of trustees." ▨▨▨▨▨▨ further reported that Mules "probably made it a general rule that students should not visit faculty homes, I'm guessing," but when asked whether Mules told ▨▨▨▨▨ how he was enforcing these rules, or how he was monitoring Levy, ▨▨▨▨▨ told T&M, "as far as I knew, the sanctions we put in place, it worked, and [was] working out alright until it hit the newspaper." There is no documentation in the Mules file that supports a conclusion that Levy was given an additional directive to refrain from having students visit him during the day. Moreover, several former students and faculty members who attended and worked at McDonogh between 1986 and 1992 reported that students continued to spend time at Levy's house which supports the conclusion that there wasn't any oversight of Levy's behavior.

---

[14] Bill Seal is deceased.

28

Former faculty member ████ reported to T&M that when he began teaching at McDonogh in 1988 "kids still went down there, hang out to watch tv." Other student accounts indicated that Levy's practice of having students at his home continued into the 1990s.  Student #28, a ████ McDonogh graduate, told T&M that he and his friends would spend time at Levy's house and that in his "group" of friends, "it was like dude you know you don't go to Major's alone." Student #24, a ████ McDonogh graduate, told T&M that going down to Levy's house "was like a secret thing, we didn't talk to teachers or administrators about it." He reported, "if we had a free period, we knew we could go and have hotdogs and play games, but like it was passed between students. We would make sure to come back, but we were free, lots of freedom there," and "in ninth and tenth grade, he would leave his house open, and Nintendo came out then, so he would have microwave food, and we would go there and play games and eat the food in the early '90s."

Notably, former student and former ███████████████████████████████████ (████), told T&M that his daughter, a member of the class of ████ and her friends were at Levy's all the time. He then told T&M, "I did know at the time that the Mules had said to their girls, 'You are not to go down to Al's house,'" and stated his daughter, "had said to us they don't go down there anymore and that was before we knew about it and we never put two and two together at that point in time," indicating that it was known that Mules' children were not allowed to frequent Levy's and that students were still spending time there. ████ ████ McDonogh Headmaster from ██████████████ also stated that he was aware when he came to McDonogh in ████ that students were still spending time at Levy's house.

In a memorandum to the file from Mules, dated February 8, 1992,[15] Mules memorialized a conversation he had the previous day with Chris Alexander ("Alexander"), Jay Ghingher ("Ghingher") and ████ regarding the action McDonogh "should take regarding Levy." Mules wrote, "With my departure from campus in some 4 months' time, it is necessary for some action to be taken in order to prevent any recurrence of the events revealed to me some years ago and documented in my file on this topic." Mules further explained that he had first introduced this topic to Ghingher and Alexander several months before with a recommendation that Levy be required to leave his campus home, possibly move to a retirement center, and that his employment be discontinued.  This memo makes clear that Ghingher and Alexander sought the advice of former Board Chairs who had previously been informed by Mules of Levy's conduct when he first received the report from Student #12 in 1986. The memo continues that Ghingher and Alexander informed Mules that they wanted to "limit" action to the requirement that Levy leave McDonogh's campus, and that ████ had volunteered to join Mules in presenting this decision to Levy. A "Confidential Memorandum" to the file from Mules, dated February 9, 1992, supports the conclusion that in accordance with the meeting, Mules called Levy to request a meeting with

---

[15] In this same memo, Mules wrote that he recently had spoken to a classmate, Harry Rash, who described to him an incident that occurred when they were both juniors at McDonogh.  Mules also wrote, "He rebuffed Al, when Al asked him to remain at his apartment one evening and then began to give him a backrub Harry reports that he knew what was happening, pushed Al away, and left. He feels that he has been out of favor with AJL since that date."

Levy and ▮▮▮▮ after which Levy called ▮▮▮▮ and ▮▮▮▮ told Levy that the School "wanted an agreement by [him] that he would proceed deliberately to enter a life-care facility." According to the memo, Levy gave his "verbal consent" after which Mules and ▮▮▮▮ agreed that Mules would prepare a "letter of understanding" which would be delivered by ▮▮▮▮ to Levy for Levy's signature.

A letter from Mules to Levy, dated February 8, 1992, confirms that such a letter was prepared, and that Levy agreed to immediately place his name on a waiting list for a life-care facility and accept the first offer to reside in such a facility. In addition, the letter, signed by Levy on February 12, 1992, indicated that it did not "alter the agreement in effect these past 6 years, specifically, the prohibition against any student overnight guests in your home."

The evidence demonstrates that prior to Mules' departure from McDonogh, Levy and Mules had a discussion to resolve some "issues" that Mules wrote were "important to [him] and to the welfare of the School." In a "Confidential" letter from Mules to Levy, dated May 11, 1992 and signed by both Levy and Mules, Mules wrote that the letter served as "confirmation" of a discussion between Mules and Levy that morning during which Levy agreed to move to one of three "life care center[s]" referenced in the letter within 18 months and to provide a "signed contract" for a "unit." The letter also indicated that Mules intended to "inform ▮▮▮▮ of the following understandings:

> 1) That you will move to one of the facilities listed above no later than 18 months from the date of this letter and that your commitment to do so is unequivocal.
> 2) That you will continue to have no student guests stay in your home overnight.
> 3) That after this summer, McDonogh Abroad will be discontinued.[16]

The letter further states:

> That will be the limit of the information that I will provide the new Headmaster. However, it will be understood that if you fail to meet any of these three obligations, that Bo will inform me. I will, in turn, inform him of the reasons for the establishment of these criteria and, in the company of ▮▮▮▮, will provide the Chairman of the Board with a comprehensive report on this matter.

A typewritten note from Mules to Levy, dated June 18, 1992, and a receipt, dated June 1992, indicate that Levy provided Mules with proof that an "entrance fee" to a life care center had been paid and that Mules then asked that he be provided with a copy of the contract that had been executed. Documents examined by T&M indicate

---

[16] According to information gathered during the course of the investigation, the McDonogh Abroad programs for seniors were organized, managed and executed by Levy during the summers of 1961 to 1992. Although T&M did not receive any reports of inappropriate behavior or sexual misconduct by Levy while on these trips, there is no evidence to suggest that any restrictions were placed on Levy's participation in these programs after Student #12's report to McDonogh in ▮▮▮▮ Indeed, ▮▮▮▮ reported to T&M that he and his wife travelled on one of the McDonogh Abroad trips with Levy after 1986 at which point, "[he] knew [Levy] was a pedophile."

that Levy said the contract was forthcoming and that Mules then called the facility to verify that Levy had been in contact with them, which they did and further confirmed that Levy's unit would be available in the fall of 1993.

███████ told T&M when he arrived at McDonogh, he learned the "three conditions" described in Mules' letter of May 18, 1992 and that when Mules discussed them with him or showed him the letter, he indicated that Levy made him "uncomfortable." He stated:

> I don't remember him saying anything like, "Well I think this guy is a pedophile." In the broad context of Bill being essentially fired, Bill being pretty confident that Levy was a key catalyst in his firing, and thirdly his suspicion that the possibility of improper relationships with kids and prior kids was a reality. But as far as I can remember, he never said this guy is beyond a doubt a pedophile. But it was more like there are too many things that make me uncomfortable about this guy, in the interest of clearing the slate a little bit, move him off campus, make sure no student guests and discontinue the London thing, a staple of Levy's forever. Seemed to him good judgement to let me start without a whole lot of tentacles from Levy.

████ also said that Mules did not provide any additional detail about "his suspicion" and that he did not ask Mules any questions. He reported to T&M:

> And I was respectful enough of Bill to not put him in that position, of saying yes or no. I thought he probably knows stuff, maybe he knows stuff that I don't know. It seems reasonable, to allow it to take its course, to allow this guy to be off campus, no more students at his facility and no more London trips, I thought that's fair and a good way for me to begin (with him off).

### 5. Levy's Arrest

████████████████ and ████████████████████████████ reported to T&M that on September 24, 1992, Levy's attorney Nevett Steele ("Steele"), a former McDonogh student, informed ████████ and faculty member Laddie Levy that the Baltimore Police were in possession of a recorded call between Levy and Student #13 which contained incriminating admissions made by Levy about numerous sexual acts he had committed against Student #13 while a McDonogh student in the late 1970s and early 1980s. There was no evidence gathered during the investigation to suggest that McDonogh was aware of Student #13's allegations against Levy before being informed by Steele. In particular, ██████ told T&M that "some weeks" before Steele shared this information, his secretary asked him whether he had seen the two men who came to Levy's office to escort him off the McDonogh campus and that he asked Levy about this the following day, to which Levy responded that the men had been on campus to check on an alum. ██████ explained that he now believes

31

those men were plainclothes police officers who arrested Levy at the time.[17] ███████ also said that a few days before his meeting with Steele, Levy called him to say that he had been admitted to Sheppard Pratt, a psychiatric hospital in Baltimore., and that he was "okay." ████████ said that he asked Levy whether Laddie Levy, a McDonogh faculty member and Levy's nephew, knew this information and that with Levy's permission, he told Laddie Levy about the hospital admission after which both ███████ and Laddie Levy visited Levy there. ████████ recalled that Al Levy cried "like a baby" and that they believed "something pretty serious" had happened. ███████ reported that it was the next day that Steele called him and asked to meet. He said that during his conversation with Steele, he conveyed that "the police had called Al and had recorded him and so forth" after which ███████ asked ███████ and Laddie Levy to join them in his office so that Steele could report to them what he had just learned. ███████ said that Steele then told both ██████ and Laddie Levy about the recorded call and further reported that Steele said he had listened to the call many times and "in essence" told him that he believed Levy was guilty of the accusation. On September 27, 1992 an emergency board meeting was held to inform the Board of the charges against Levy.

According to court documents obtained and examined by T&M, Levy was charged on September 28, 1992 by the State's Attorney for Baltimore County with one count of Child Abuse, one count of Sexual Offense in the Second Degree, one count of Attempted Sexual Offense in the Second Degree, one count of Sexual Offense in the Third Degree and one count of Attempted Sexual Offense in the Third Degree stemming from incidents that occurred on or about and between January 1, 1977 and January 24, 1982 with a former McDonogh student.[18] In addition, Levy was charged with one count of Perverted Practice, one count of Assault, one count of Battery and one count of Sexual Offense in the 4th degree stemming from incidents that occurred on or about and between January 1, 1977 and December 30, 1986 with the same student at Levy's on campus house.

A letter from Mules to "Parents," dated September 28, 1992, indicates in pertinent part that a letter was sent to the McDonogh parent community to advise that the School was informed on September 24, 1992 "of an incident of sexual abuse which may have occurred on [the McDonogh] campus over ten years ago." The letter also indicated that "a student who had graduated from McDonogh many years ago has recently filed a charge against Al Levy and Mr. Levy intends not to contest the charge." Moreover, Mules wrote, "[Levy] is no longer an employee of the school or a resident on the campus and is presently

---

[17] T&M's examination of the court documents related to the allegations against Levy include an "Arrest Warrant on Charging Document" which indicates that on August 17, 1992, Detective Schneider of the Baltimore County Police Department executed the warrant by arresting Levy and delivering to him a copy of the Statement of Charges.

[18] The former McDonogh student referenced in the charging documents was identified as Student #13. On May 2, 2017, T&M sent Student #13 a written request seeking an interview as part of its investigation. Student #13 did not respond to our written request. Based upon T&M's review of the State's Attorney charging document, the incidents included the sexual acts of "fellatio" and "fondling" at Levy's campus residence. In addition, these same documents indicate that on August 13, 1992 a controlled call was made to Levy by Student #13 during which Levy acknowledged that the acts had occurred.

hospitalized for severe depression." Notes in the file further indicate that McDonogh faculty and staff were provided with similar information.

Furthermore, a letter from Board Chair Ghingher, dated October 2, 1992, indicates that McDonogh alumni were also provided with this information but also told that Levy was "expected to plead guilty in the proceedings pending before the Circuit Court for Baltimore County," that Levy was still hospitalized for severe depression and that he would be living off campus upon his release. A letter from Nevett Steele, dated October 21, 1992, to Suzanne Mensh, Clerk of the Circuit Court for Baltimore County, indicates that Steele wrote to inform the Court that Levy had moved and that he was residing at an apartment in Ruxton Towers in Towson, Maryland.

Moreover, the evidence gathered during the investigation suggests that once information about the charges against Levy were known to the McDonogh community, other students reported inappropriate behavior by Levy. Student #7 told T&M that following Levy's arrest and the surrounding media attention that appears to have begun as early as September 30, 1992, he called McDonogh Dean of Faculty Hugh Burgess ("Burgess") to discuss his own experiences with Levy. Student #7 reported to T&M, "I called to throw my two cents in and I spoke with Hugh and wondered if that went into the official file or if that phone call was ignored." He reported that at the time of that phone call, he told Burgess "everything that I knew." Notably, Burgess did not respond to T&M's request for an interview and a review of Burgess' file and other School documents did not reveal any documentation related to this phone call. T&M did review an undated handwritten note signed by ▓▓▓ to "Hugh, Dan, Albie, Larry and Bill" providing a suggested response in the event that one of them received "a call claiming" that the caller was "sexually abused while [they] were at McDonogh." ▓▓▓ wrote that the response should be as follows: "We will certainly give what you are saying every consideration, but I don't believe there will be any further action by the school at this time." The note further indicates that "the statement represents advice from [McDonogh's] lawyer."

A draft of a letter from Mules to "Patrons," dated October 13, 1992, indicates that additional information about Levy's abuse of other children had come to the attention of the Baltimore County District Attorney and the School. ▓▓▓ wrote:

> Recently I sent you a letter telling you about the sad and unfortunate situation with Al Levy. At the time I told you the facts as we knew them and promised to advise you of any further developments.
>
> In keeping with that commitment, let me relate to you recent events. The Baltimore county District Attorney will file additional charges of child sexual abuse against Mr. Levy. It will be charge that there were xx additional children abused. As with the first charge, Mr. Levy will not contest the charges.

████ told T&M that he did not know if others had gone to law enforcement to report that they had been abused by Levy, but acknowledged that he "heard a lot of the same things others did, that there were others, that there weren't."

████ also reported that "when everything hit the fan with Major Levy," he called former classmate ████ to talk about his recollection that Jones had distanced himself from Levy when they were in school. ████ reported that he asked ████ "Did anything go on with you and Al?" and told him that he had noticed ████ had stopped spending time in Levy's apartment while a student. ████ explained that ████ told him that on a Monday night, he was alone with Levy in Levy's apartment and that Levy "put the moves on" ████ after which ████ said he decided to stay away from Levy. ████ said he asked ████ why he did not report what Levy had done and that ████ told him, "I just thought he was harmless," and that ████ decided to avoid Levy from that point forward other than occasionally going to Levy's apartment when he knew Levy would not be there. ████ told him that ████ did not elaborate on how Levy had "put the moves" on him and said they never discussed this again.

According to court documents, Levy was diagnosed with a brain tumor prior to a plea or trial, and on January 10, 1993 Levy passed away. On January 21, 1993 the case against Levy was abated by death.

## B. Robert Creed

1. **Robert Creed touched the penis of and engaged in oral and anal sex with a 14-year-old male McDonogh student during the ████ academic year, masturbated and engaged in repeated acts of oral sex with a 14-year-old male McDonogh student between ██ and ████ and engaged in acts of inappropriate behavior of a sexual nature with two McDonogh high school students between 1978 and 1985.**

The credible evidence gathered during the course of the investigation supports a finding that Robert Creed ("Creed"), a McDonogh foreign language faculty member from 1969 until his resignation on July 1, 1985, touched the penis of and engaged in oral sex and anal sex with one 14-year-old male student, repeatedly masturbated the penis of and engaged in repeated acts of oral sex with another 14-year-old male student and engaged in acts of inappropriate behavior of a sexual nature, including exposing his naked penis as well as lewd gesturing and discussing his penis, with two male high school students.

Student #20 reported that in ████ when he was a 14-year-old ninth-grade boarding student, he was encouraged to go to Creed's apartment with other students on weeknights "to watch T.V. and have popcorn." This student told T&M that on one of those visits, towards the end of the school year, he was alone with Creed when Creed handed him a pornographic magazine and said, "Take a look at this." Student #20 recalled that he had only been exposed to pornography on one other occasion, also at Creed's apartment, and said that he "was curious and excited" about it. He stated that he was seated in a chair and Creed "saw [he] had a hard on, leaned over, put his hand on [his] thigh and said, 'Let me help you with that.'" He continued:

34

> He came to [the] front and got on his knees and gave me a blow job and I had never had sex with anyone before and it obviously felt good and I let it go on and I didn't climax or orgasm so, after a while he said, "Why don't we go in here," [to the] bedroom and I said, "Ok."

He reported that Creed then told him to get "undressed" which he did, as did Creed. The student further reported, "[Creed] said, 'Let's try this' and he raised my legs up and proceeded to have anal sex with me and he continued." Student #20 said that Creed ejaculated and that he remembered "not being there much longer." He told T&M that Creed was "aggressive" during this interaction, and described feeling extremely "embarrassed" and confused about being "considered gay." He said he remembered "trying to avoid walking near" Creed's classroom after this interaction since he "did not want to run into him." This student told T&M that he did not report what Creed had done to him to anyone at McDonogh.

Student #28 a ▮▮▮▮ graduate of McDonogh, reported that Creed's sexual abuse of him began in the 9th grade when he was 14 years old and a student in Creed's Spanish class, and that the abuse continued until the middle of the student's sophomore year. He explained that Creed invited students to his campus apartment "for games and tutoring." The student stated that although "Spanish was not super hard" for him, he went to Creed's apartment expressly to be tutored. He told T&M that he went over to Creed's apartment after school and that during one of his first two visits, while Creed was tutoring him at a table in the living room, Creed reached his hand into Student #28's lap, and put his hand on the student's penis over his clothing. He described that Creed then stood up and further stated, "He got behind me, picked me up and threw me on the couch." He detailed that Creed put his arms around his chest from behind and picked him up so violently that his feet left the ground. He told T&M, "When he was holding me, I was very scared. It felt violent. I was really scared, I felt constrained." He recalled Creed saying his name out loud in a "laughing" manner, and described to T&M that Creed then pulled the student's penis out of his pants and masturbated him to ejaculation. He also stated that Creed said to him, "Come next week," before the student left Creed's apartment and the student complied with Creed's request. The student said that he was upset about what happened but that he kept going back and recalled that after about the "second or third time" that Creed masturbated him, Creed began performing oral sex on him. The student told T&M that he estimated the "frequency [of the sexual abuse] at two to four, two to three times per month," and said that Creed always unzipped the student's pants and pulled down the student's underwear to expose his penis before Creed touched it with his mouth or hands. In addition, the student said that he never touched Creed's penis or was asked by Creed to do so. The student further reported that he started becoming a "behavior problem in class" and as a result, Creed began to get "unhappy" with him and "stopped inviting [him] over." This student further reported to T&M that he told some friends and two McDonogh faculty members, ▮▮▮▮▮▮▮▮▮ and Marty McKibbon ("McKibbon") in ▮▮▮, during his senior year, about what Creed had done to him.

35

Student #11 told T&M that on one occasion during either his sophomore or junior year between ▮▮▮ and ▮▮▮ he found himself alone in a basement locker room bathroom with Creed. He explained that he was using one of between six to ten urinals when he "felt a looming presence next to" him. He "looked over and up" and saw Creed "exposing his penis to me, making sure I could see it." He said that Creed "wasn't close enough to the urinal" to be using it and "was speaking to [the student] in a way that he wanted to interact with [the student] at the urinal, have [the student] look at him." Creed said the student's name in a deep voice and the student then "buttoned up" and ran out of the bathroom.

Although he could not recall precisely when these events occurred while he was an upper school student, Student #15 a ▮▮▮ McDonogh graduate, said that Creed "exposed himself" to the student in the bathroom on "two to three" occasions. He told T&M that as he stood at the urinal with Creed alone or with other students, Creed "turned to" him and "made lewd comments about himself." He explained that Creed referenced the size of his own penis, asking the student something like, "Have you ever seen one like this?" The student said that while he was asking the question, Creed was "grabbing" and "waving" his penis before continuing to urinate. This student also reported to T&M that it "widely known" within the McDonogh student population that Creed engaged in this type of behavior. He recalled that students discussed whether Creed had ever shown them or talked about his penis, asking each other, "Has he ever done this? Stand next to you in the urinal?"

### 2. Student #28's abuse by Creed was reported to McDonogh in 1985.

The evidence gathered during the course of the investigation supports the conclusion that Creed's sexual abuse of Student #28 came to McDonogh's attention in the spring or summer of 1985 and that Creed resigned from McDonogh on July 1, 1985 as a result of the information learned. Student #28 reported that in 1985, during March or April of his senior year, he disclosed to ▮▮▮▮▮▮, a McDonogh faculty member at the time, that Creed had sexually abused him. He explained, "towards the end of my senior year, things were bubbling up, I was starting to tell people," and said that he decided to tell ▮▮▮ who was a "young" teacher of his. He said that he did not think that ▮▮▮ believed him, took him seriously, or reported the abuse to anyone. ▮▮▮ recalled that this student came to him and told him "that something happened." He reported to T&M, "He didn't say exactly what happened," and said that the student was "vague" and didn't "graphically describe" the abuse but that he "figured out what was going on." ▮▮▮ further reported, "I wasn't quite sure if I believed him at first because he was an odd kid, but I gave him [the] benefit of doubt and responded by telling him 'you need to go to the administration immediately or I'm going.'" ▮▮▮ stated that he had no recollection of speaking to any McDonogh administrator about the allegation but told T&M, "I knew [the student] reported right away [so] I didn't worry about it further because the administration knew about it." ▮▮▮ also said that he "remember something about McKibbon," another McDonogh faculty member, being aware of the same allegation but could not recall whether he spoke with McKibbon directly. He said that he

didn't "remember talking to anyone about it once [it was] reported, [he] probably told someone about it, that [the student] told me, but don't recall who."

Student #28 reported that he also disclosed Creed's abuse to Marty McKibbon, his history teacher, close to the date of his graduation.  He said that he "told him everything" over the telephone one evening, and that an hour after hanging up from the call, McKibbon called him back and said, "[Student #28], I called Dr. Mules. I didn't tell him who it was or your name. He would like to meet with you. You have an appointment tomorrow at 2 p.m. He will not know who you are 'til you show up." Student #28 said that he went to see Mules the following day and that he "sat down and told him everything."   This student described to T&M that he felt as though Mules "believed [him] completely." Student #28 also recalled that in a follow up conversation with Mules, Mules convinced Student #28 to bring his parents with him to Mules' office. Student #28 said that either in the meeting with his parents and Mules or another meeting he had alone with Mules, it was Mules who first brought up the idea of reporting Creed's abuse to law enforcement. He told T&M that Mules said, "The school is interested in keeping it quiet, not making it public, but from a personal standpoint, I wouldn't blame you to go to the police and make charges." Student #28 said that until that point, he hadn't even considered contacting law enforcement, and that Mules also told him "I would appreciate it being quiet, but that is not the priority," and further stated, "We will not stand in your way, we're interested in it not getting to the press but you do what you want."  He also told T&M that he asked Mules how he would go about reporting the events to law enforcement, and Mules advised him to report Creed to the Juvenile Division of the police in Baltimore County which the student then did.[19]

Notably, a review of Creed's personnel file from his tenure at McDonogh indicates that on February 8, 1985, he signed a contract renewal for the 1985-1986 school year and that on June 17, 1985, he submitted a signed letter of resignation to Mules effective July 1, 1985. T&M also reviewed a typed unsigned document, dated June 21, 1985, indicating that Creed was to be paid "three months' salary at 1984-85 salary level" in a "single lump sum payment on or before August 1, 1985." Creed's personnel file also contains an unsigned letter documenting his dates of employment and teaching responsibilities throughout his tenure at McDonogh, and an unsigned, undated paper with handwritten notes indicating that the John Carrol School wanted "a letter of reco" since they were "ready to offer" Creed a part-time job. T&M's review of the board minutes from that time period indicate that Mules informed the Board of Trustees in June 1985 that Creed "tendered his

---

[19] T&M's investigation revealed that law enforcement requested that Student #28 submit to a polygraph examination after which Creed's arrest was authorized. T&M endeavored to obtain the Court file. However, T&M was informed by a Baltimore County Courthouse Clerk that the court file had been destroyed. T&M was able to access a public electronic case record of the Baltimore County criminal case against Creed which indicates that Creed was charged by the State Attorney for Baltimore County with one count of Child Abuse, one count of Assault and one count of Sexual Offense in the 4th Degree stemming from incidents that occurred prior to 1986 at Creed's apartment on McDonogh's campus.  On April 28, 1986, Creed pled guilty to one count of Child Abuse and one count of Sexual Offense – Fourth Degree, and entered a plea of Nolle Prosequi to one count of Assault. On April 29, 1986, Creed was sentenced to Probation and on June 6, 1988, a Petition and Order for Early Termination of Probation and Discharge of Probationer was entered by the Court.

resignation for personal reasons," and that prior to August 1985 a "memorandum" was disseminated to all trustees in which Mules "described in detail the circumstances under which Dr. Creed decided to tender his resignation."[20]    T&M did not review the memorandum referenced during the course of the investigation because it was not included as part of Creed's personnel file that was provided to T&M. As a result, T&M was not able to determine what specific information was shared with the Board. Moreover, T&M spoke with two former board members from 1985, Ghingher and ███████████████████ and none of them had any recollection of any discussions relating to Creed, the allegation, or his subsequent arrest. Notably, there was also no documentary evidence provided to T&M to indicate who met with Creed, or whether any of this information was brought to the attention of anyone else at McDonogh.

Notwithstanding T&M's inability to interview Creed or Mules and a lack of recall by Board members about what specifically occurred, the evidence gathered during the course of the investigation supports the conclusion that Creed's sexual abuse of Student #28 came to McDonogh's attention in the spring or summer of 1985 and that Creed's resignation on June 17, 1985 effective on July 1, 1985 was the direct result of that student's complaint to Mules.

### C. Robert Jarboe

1. **Robert Jarboe[21] engaged in repeated acts of sexual contact, including oral sex with one 15-year-old female McDonogh student and engaged in repeated acts of sexual contact, including oral sex and sexual intercourse, with another female McDonogh student from ███ when that student was a 15-year-old sophomore until her graduation from McDonogh in ████**

The credible evidence gathered during the course of T&M's investigation also supports a finding that Robert Jarboe[22] ("Jarboe") an upper school English teacher employed by McDonogh from 1976 through 1988, engaged in repeated acts of oral sex with a female McDonough student during her sophomore year and repeated acts of sexual intercourse and oral sex with this student's sister, from the time she was a sophomore in 1984 until her graduation in 1987.

Student #30, a ████ graduate, reported to T&M that throughout her sophomore year at McDonogh, Jarboe sexually abused her, and subsequently sexually abused her younger sister, Student #31, when she was also a 15-year-old sophomore at McDonogh. Student #30 told T&M that her interaction began when she

---

[20] Board minutes dated August 28, 1985 also state "it was unanimously approved by the Executive Committee of the Board of Trustees that Headmaster Mules and his administration had, to date, handled the circumstances surrounding Dr. Robert Creed's resignation in an exemplary manner."

[21] Jarboe is also a 1964 graduate of McDonogh.

[22] T&M sent a letter via Federal Express to Robert Jarboe's current address. The letter requested that Jarboe contact T&M and offered him an opportunity to participate in the investigation. T&M received a letter and email response, dated Sept. 21, 2017, from Jarboe's attorney, Edmund J. O'Mealley, stating "Mr. Jarboe denies any and all allegations of any inappropriate personal interactions with students and declines your invitation for an interview."

developed an interest in photography and Jarboe asked her to take photographs for an ornithology club project. Student #30 said that while she and Jarboe spent part of a weekend "hiking out around the woods in McDonogh" photographing birds, he told her "I'd really like to just kiss you now," and she responded, "I don't think that's a good idea." Student #30 recalled that soon after, their interactions became "full, full sexual contact." She explained that he performed oral sex on her, and that she performed oral sex on him but said that she could not recall whether they had engaged in sexual intercourse. She also noted that if they had not, "it came damn close." She told T&M that she could not recall all the occasions on which they engaged in sexual interactions or whether such interactions occurred on the McDonogh campus. She did, however, recall an occasion on which she went to a town 40 minutes away from McDonogh to meet Jarboe and that they generally spent time "kind of fooling around."  She told T&M that she and a "whole bunch" of friends would also spend time at Jarboe's house on campus and when asked to explain the discussions in which they would engage when alone, she said, "I don't know if he was romanticizing, somehow I was this amazing person who brought joy to his life." She further stated that Jarboe told her that his "wife didn't understand him."  Student #30 reported that she "just knew" that their sexual interactions were wrong, and that sometimes she was "afraid" of them.

This student's sister, Student #31, a ▓▓▓▓ graduate of McDonogh, reported to T&M that she was first introduced to Jarboe when she was in 7th or 8th grade and a member of a team for which he was the coach. Student #31 told T&M that she had been aware that her sister had a "relationship" with Jarboe. She said, "And I knew she stopped it, and out of jealousy or whatever was going on in my 15-year-old brain, I thought if she could do it, I could do it." Student #31 recalled to T&M that her sister had tried to convince her not to interact with Jarboe and that she said "'Please don't do this, let's tell mom and dad.'"  She told T&M that her relationship with Jarboe began at the beginning of her sophomore year when they were alone on campus on one occasion looking at birds as part of the ornithology club and that she believed that Jarboe may have kissed her on that day.  She reported that their relationship became sexual "very quickly" and said that their first sexual interaction occurred on a Sunday in the fall of her sophomore year in the computer lab of the high school while "putting in ornithological data." She told T&M that during "the first sexual experience, [she] gave him oral sex, he stopped it and [they] had vaginal intercourse." She said that they also had intercourse at his house on campus, in the back of his car, and when they went out "hawking" for the ornithology club. She noted that on one occasion, they "finagled" a camping trip in the woods and had sex on that occasion as well. Indeed, this student's sister also told T&M that she recalled going on a camping trip with both Jarboe and her sister. She reported:

> And I remember I was pretty certain I was going to go on it to prevent anything from happening, but as it would happen I couldn't have stopped it either way according to her. And something did happen there.

Student #31 told T&M that she and Jarboe discussed "needing to make sure that no one knew," and that they met more often on weekdays than on weekends, explaining that since Jarboe's wife worked outside

the home and his children were in school during the week, the house was empty on weekdays. She recalled that they most often engaged in vaginal intercourse but that on one occasion "at his house," Jarboe performed "oral sex" on her. She reported, "One time we had oral sex. He said after that he wasn't going to wash his face after because he wanted to go back to school smelling of me." She also said that she remembered feeling "weird" when he made that comment. In addition, she told T&M that they had sex "as often as circumstances allowed, as much as we could manage," and that at the beginning that averaged once a week but later changed to once a month on average.  Student #31 told T&M that she also dated Jarboe's son for four to six weeks during her senior year and that Jarboe was "absolutely angry" about it and continued to interact sexually with her even while she was dating his son.  She said that her sexual relationship with Jarboe lasted until she graduated McDonogh.

> **2.  There is no evidence to support a conclusion that Jarboe's sexual interactions with Students #30 and #31 were known to McDonogh. McDonogh was aware of allegations of sexual misconduct by Jarboe in 1988 and investigated those allegations.**

Neither student #30 or Student #31 told T&M that they ever reported Jarboe's sexual abuse of them to any adult at McDonogh. Student #31 disclosed her interactions with Jarboe to her parents in ▇▇▇▇ while she was still a student and further reported that her parents confronted Jarboe directly, warning him to stay away from student #31 "or they would go to the police."  The parents of former Students #31 and #30 told T&M that when they confronted Jarboe, they told him to "start thinking about another job somewhere else," and that Jarboe barely responded to them. The students' father recalled, "My impression was that he was scared and he knew that he all of a sudden he was in deep trouble." Student #30 also told T&M that she eventually disclosed her interactions with Jarboe to her parents after her graduation and believed that her parents spoke to Jarboe about what she told them. The parents also reported that they believed Jarboe left McDonogh at the end of the ▇▇▇▇ school year and that they chose not to speak to anyone at McDonogh about what their daughters told them because "[they] were trying to protect the girls and get them finished with school."

While the evidence does not support a conclusion that McDonogh was aware of Jarboe's sexual abuse of Students #30 and #31, documents examined by T&M during the course of the investigation demonstrate that McDonogh was aware of and investigated allegations of Jarboe's sexual misconduct with two other students,  Students #32 and #33 in the spring of 1988.[23] Indeed, those documents provide a timeline of events,

---

[23] T&M's review of a memorandum from Jarboe's personnel file, dated June 29, 1988 and signed by Hugh Burgess, indicates that Burgess participated in a conversation with a McDonogh faculty member about her knowledge of rumors that existed during the ▇▇▇▇▇▇ academic year related to Students #32 and #33. The memo indicates that during that conversation, the faculty member mentioned that although she had never seen any behavior by Jarboe that she thought was "inappropriate," she said that she believed rumors about him circulated because he "over the years had always appeared to have special relationships with certain female students and was frequently observed in his classroom – with doors open – deeply engaged in what appeared to be personal and serious conversations with one of those girls. [Students #30 and #31] and [another student] are numbered among these relationships."

including when McDonogh learned of the allegations, what steps they took to gather additional information related to those allegations and what the School did in response to the information learned. Notably, Student #32 and Jarboe declined to speak to T&M, and Student #33 did not respond to T&M's letter. However, a confidential memorandum signed by Mules dated June 3, 1988 indicates that Mules had a conference with student #33's father during which the father reported that he learned from his daughter in "pieces" over a "period of weeks" in May that Jarboe made "advances" towards her which included kissing and hugging. Additionally, a letter from Jarboe to that student's father, dated June 14, 1988, indicates that Mules, Dean of Faculty Hugh Burgess[24] and Jarboe met that day to discuss "charges" Student #33 had made against Jarboe. According to the information in the letter, Jarboe believed that the student "wrongly accused" him and that he "never made sexual advances on her or to any other McDonogh student." In addition, the letter indicates that Jarboe had "on several occasions admonished <u>her</u> for doing things which might be construed as sexually enticing [him]" and details that the student would "lift her skirt to a length [he] deemed improper," try to "get" his attention by running "her hand along a run in her stocking," and act as a "distraught student" in need of a "shoulder-to cry on." He further acknowledged an embrace that lacked any "sexual overtones," and noted that he "dismissed" her "flirtations" as "girls-will-be girls behavior." Jarboe also wrote that the student took "offense" at criticism he gave her in her role as an editor of a school publication, and that her allegations against him were the result of anger over a censorship issue.

A confidential memorandum from Burgess to Jarboe's file, dated June 16, 1988 indicates that a faculty member heard rumors earlier in the year that Jarboe and Student #32 "were having an affair," and that when asked by that faculty member if there was any substance to the rumors, Jarboe said that he wasn't having an affair. As this faculty member was "convinced" the rumors were false, no additional action was taken. The memo also indicated that the School would speak to all people mentioned in the memo, including Student #32, which other memos examined by T&M indicate was done.  In a three-page letter from Jarboe to Mules, dated June 17, 1988, Jarboe indicated his "anger and embarrassment at having to defend [himself]" and his patience "while waiting for malicious gossip and rumor-spreading to stop." According to the letter, Jarboe was warned by Student #32 that Student #33 was "going to get" him and that he believed these rumors stemmed from a censorship issue on one of the school publications. The letter further states he "wasn't seducing" Student #33, that he "acted properly," and references Student #33 as an "emotionally disturbed child," and one who was creating "vindictive lies." A typewritten note from Mules on June 20, 1988 indicates that based on "comments made by Bob Jarboe- and included in his June 17 letter," McDonogh would investigate the matter further.

Additional documents examined by T&M indicate that McDonogh further investigated the matter. Typewritten notes of a phone call which took place on June 26, 1988 between the father of Student #33 and

---

[24] On May 2, 2017, T&M was informed that Burgess received the letter T&M sent to him via Federal Express requesting an interview. On June 21, 2017, T&M learned that a second letter sent to him via Federal Express requesting an interview had also been received. He did not respond to either of T&M's letters.

Mules states that Student #33 refuted Jarboe's description of her as a "hysterical young girl," explained that Jarboe made two "advances" on her, including a kiss, and said that Jarboe asked her if she "wanted him to zip up her dress- which she had left open." A typewritten memorandum of a meeting held in furtherance of the School's investigation on  June 27, 1988 between Jarboe, Mules, Burgess and the father of Student #33, reflect that Jarboe denied any wrongdoing, indicating instead that it was her "father's pressure – to make Dean's list or leave McDonogh…that had caused her to look for a scapegoat," and that without further "evidence" Mules would "not pursue the matter any further" and  would instead use Jarboe's "impeccable record as the deciding factor." However, a typed follow up note by Mules, dated July 8, 1988, indicates that after a recent meeting between Burgess, Student #32 and the student's mother, Mules believed "there is reason for serious concern about how Bob Jarboe behaved."

A confidential typed memorandum signed by Burgess, dated July 13, 1988, provides a chronology of events gathered during a meeting with Mules, Burgess, Student #33, Student #32 and the father of Student #33 indicating that Jarboe had engaged in inappropriate behavior with both Student #33 and Student #32. The memo, in pertinent part, indicates that, in the fall of ▮▮▮ Jarboe "discovers a journal entry" of Student #33 which he believed were "declarations of love" for him and consequently, wrote a poem in response. Additionally, he gave a "six-page letter or essay" to Student #33 on "love and lust."  The memo indicated that in January of ▮▮▮ Jarboe, "hugs" Student #33 multiple times, 'kisses' her in a non "platonic" way, tells her he "fantasizes making love" to her and continues to call her home leaving Student #33 to become "uneasy."  The memo further indicates that in March of 1988, Jarboe told Student #32 "he has the same feelings for her that he had had for [Student #33], that [Student #33 becomes angry]," and "rumors circulate." The memo also indicates that in April ▮▮▮ Jarboe sent Student #32 notes and "places tulips on the seat of her car," to which Student #32 responds by telling Jarboe to leave her alone.  The memo indicates that Student #32 told Burgess that her "relationship" with Jarboe "has no physical elements, except some occasional touching."

A confidential memorandum signed by Mules, dated July 13, 1988, about the "conference" held that day between Burgess, Mules, Student #33, that student's father and Student #32, aligns in material respects with Burgess' written chronology of events as presented by Students #32 and #33 in that meeting. Specifically, the memo indicates that it was explained to the students and the father that the "purpose" of the meeting was to hear "first-hand about their relationships this past year with Bob Jarboe and to establish an accurate chronology of the relevant events." Noting that Burgess recorded the "sequence of events," Mules wrote that he believed the salient points of the conversation included that Jarboe had given Student #33 a suggestive poem, told Student #33 that he fantasized about making love to her, told Student #32 that he had "the same feelings" for her as he did for Student #33, sent Student #32 a note that she considered to be "quite suggestive," put flowers on the seat of Student #32's car and persisted in sending that student poems after she told him "twice" to "leave [her] alone." Mules also wrote at the end of the memo: "The two girls bear one another out.

42

They give me every appearance of being honest and reasonably candid. They may be holding back somewhat – but only to [make] their involvement appear less significant."

A confidential memorandum, dated July 14, 1988, signed by Mules memorializes a meeting between Mules, Burgess and Jarboe during which Burgess read the July 13 "chronology of events" and Mules told Jarboe that he had "lost confidence in his ability to be an effective teacher at McDonogh." The memo further indicates that Jarboe's "reaction was to offer his resignation," after which the group talked about next steps and "arrangements" that had been made after which Jarboe "expressed appreciation" for the way the School was "handling the matter."

A "personal and confidential" letter from Mules to Jarboe, dated July 14, 1988, memorializes a prior conversation during which Jarboe was told he would "not continue as a teacher at McDonogh" beyond the date of the letter "under the following conditions," including that McDonogh would provide full pay until December 31, 1988, McDonogh would continue to pay his insurance benefits for a full year, McDonogh would pay, $2500.00 towards counseling services, that he would not be "rehired" at McDonogh "for the foreseeable future," that McDonogh would provide a recommendation on his behalf "for employment that does not deal with young people," and that McDonogh would " not provide a recommendation for employment in education until [it] received an endorsement from [his] counselor relating to [his] suitability for such a career." This letter bears Jarboe's signature and the date, July 22, 1988. In a handwritten note from Jarboe to Mules, on that same date, Jarboe wrote that he felt he had "disappointed his friends," that he was "truly sorry to have contributed to this moment in the history of an institution I have loved ever since Maj. MacHammer first grinned at me," and thanked both Mules and Burgess for having shown him "compassion, understanding and assistance."

A confidential memorandum from Mules to the McDonogh Board of Trustees, dated August 4, 1988, indicates that the "confidential matter" discussed at the July board meeting had been "brought to a prompt and equitable conclusion" and that "Bob Jarboe's teaching contract ha[d] been terminated." The memo also indicates that the School informed the Board that Jarboe would be given "some financial support and benefits, and the School [would] contribute towards the cost of professional counseling" and states that "that process ha[d] already begun. In addition, according to the memo, "statements by the administration concerning this matter" would generally be:

> Bob Jarboe has requested and been granted a leave of absence for the upcoming School year. We have reached a mutual agreement that it is an appropriate time for him to consider matters that pertain to his career and his future.

The memo concludes with two statements: 1) Bob knows that he will not return to McDonogh to teach, and 2) The School's lawyers have been informed.

**D. Dennis O'Brien**

1.   Between ▇▇▇▇▇▇ Dennis O'Brien engaged in repeated acts of sexual misconduct with a 12-14-year-old female McDonogh student that included kissing, touching of her naked breasts and pressing his body against her body while they slept together in a tent. O'Brien also engaged in sexual intercourse with this same student in ▇▇▇ when she was 18 years old. Dennis O'Brien also engaged in inappropriate behavior between a teacher and a female middle school student in ▇▇▇ made unwelcome comments of a sexual nature to a 12-year-old female McDonogh student in ▇▇▇▇ and engaged in repeated acts of sexual misconduct with that student in ▇▇▇▇ when she was 17 years old, including kissing, touching of her naked breasts and pressing his erect penis against her body. O'Brien also kissed another 17-year-old female McDonogh student in ▇▇▇

The credible evidence gathered during the course of the investigation supports a finding that Dennis O'Brien, a McDonogh social studies faculty member between 1977 and 1986, engaged in repeated acts of sexual misconduct with a 12-14-year-old female McDonogh student that included kissing, touching of her naked breasts and pressing his body against her body while they slept together in a tent as well as engaging in sexual intercourse with this same student in ▇▇▇ when she was 18 years old. O'Brien also engaged in inappropriate behavior between a teacher and a female middle school student in ▇▇▇, made unwelcome comments of a sexual nature to a 12-year-old female McDonogh student in ▇▇▇▇ and engaged in repeated acts of sexual misconduct with that student in ▇▇▇▇ when she was 17 years old, including kissing, touching of her naked breasts and pressing his erect penis against her body. The evidence also supports the conclusion that O'Brien kissed another 17-year-old female McDonogh student in ▇▇▇

Student #38 reported to T&M that her first inappropriate interaction with O'Brien occurred when she was either 12 or 13 years old, on a fall McDonogh backpacking club hike with O'Brien, faculty member Doug Cooper ("Cooper") and other McDonogh students. She reported to T&M that she and O'Brien were walking separately from the other students, when O'Brien told her to "look up at something" and then kissed her on the lips with a kiss that lasted "too long." Student #38 told T&M that she could not recall whether there was any discussion about the kiss but told T&M she "was shaking," and that "it was terrible."

This student also recalled during 7th and 8th grade going on multiple overnight trips through the backpacking club as well as during the Summer Sail program that were staffed by O'Brien. She said that Cooper also staffed the backpacking overnight trips. She told T&M that there were approximately ten students who attended these overnights, and that there were "at least half a dozen times" that she shared a tent with O'Brien "laying right in, on top of him face to face, with their clothes on, in his sleeping bag for the entire night." She reported that they would kiss on the lips and that during a few of those overnights, Cooper also shared a tent with them, and she recalled that she did not sneak into the tent but rather went directly to his tent when it was time to go to sleep.

Student #38 told T&M that during the summer between 8th and 9th grade, when she was 14 years old, O'Brien came to her home and convinced her mother to allow Student #38 to go sailing with him. Student

44

#38 recalled that he reassured her mother that additional people would be sailing with them and that after that conversation, she left to go sailing with him alone. This student told T&M that while on the boat:

> We were out there on the water, and it's almost like he knew that we couldn't have intercourse, but he was, I just remember taking off all my clothes, I think he did too, and we went into the water when we anchored the boat.

Student #38 described that while on the boat O'Brien kissed her on the lips and touched her breasts with his hands, making skin to skin contact both when they were on the deck of the boat as well as when they were in an interior part of the boat. She also described that both of them took off all of their clothes, including their underwear, and went into the water "completely naked" where there was also touching between the two of them.

Student #38 reported that she did not have any further physical or sexual interactions with O'Brien until the summer after her graduation, when she was 18 years old. She recalled going to O'Brien's house after graduation and that he told her "there's no way he could have children, he had a vasectomy," and that the two of them kissed and had sexual intercourse on his sofa. She also said that was the last time she had any interaction with him, that it was like "the grand finale."

While Student #34 did not respond to T&M's request for an interview and T&M was unable to speak with that student's parents, T&M's review of documents in O'Brien's personnel file supports the conclusion that O'Brien engaged in inappropriate behavior between a teacher and middle school student by visiting the student at the camp where that middle school student was working during the summer, kissing her there and writing a personal letter to the student. Specifically, a "Memorandum for the Record," dated November 3, █████ signed by Bill Mules appears to memorialize a meeting between Mules, Burgess, Q.D. Thompson[25] and Student #34's parents, and details that the parents brought their concerns about the relationship between their daughter and O'Brien to the School's attention after learning from her that O'Brien had visited her at camp the preceding summer and kissed her there. The memo indicates that the parents described the kiss during the meeting as a "not cordial 'hello-goodbye' kiss on the cheek," and that Student #34 "got away" as fast as she could "without running." The file also contained a personal letter from O'Brien to Student #34 with an invitation from O'Brien for the student to visit him and do some night sailing. The letter also reads, in pertinent part, "It seems the few females that I see occasionally prefer more sedate activities and aren't that big on sailing, hiking and exploring. So if you're game, there's a lot to do when you get here!" Moreover, additional memoranda and notes in the file indicate that O'Brien was spoken to about his interactions with the student and acknowledged that he believed the student had a crush on him but also believed that "such crushes were not to be discouraged" and that an "unusual closeness prevailed" in the Middle School especially among those who went camping and

---

[25] On May 1, 2017 T&M sent a letter by Federal Express to Thompson. Thompson's son contacted T&M to report that his father had recently been placed on hospice and as such, was unable to speak with T&M.  T&M learned from ███████ ███████ that Thompson passed away soon after that.

sailing together. And while the documents in O'Brien's file memorializing conversations between School officials and O'Brien about this event discuss O'Brien's incredulous "response" to the School's suggestion that something inappropriate occurred, there is no documentation of O'Brien's specific version of what transpired. As a result, T&M is unable to determine the specific nature of the kiss discussed.

Student #35 reported to T&M that her first uncomfortable interaction with O'Brien also occurred when she was 12 years old and on O'Brien's 37-foot sailboat during an event called Summer Sail with other seventh grade students and O'Brien's wife. She reported to T&M that prior to this sailing trip she had developed a close relationship with O'Brien who she said paid "extra" attention to her and made her his "pet." She explained that he made her feel "important," and that as a "small and skinny, shy" child she felt that he "gave her wings" and made her "feel like a big deal" in and out of the classroom. This student told T&M that on the first evening of the sailing trip, she changed into her nightgown in the boat's bathroom and described O'Brien's reaction when she emerged from the bathroom. She said:

> He looked up at me, his eyes got huge, he said, "Oh no, no, no, you need to go back into that bathroom and change." I didn't think about, I was 12 and didn't know – I didn't consider the sexual aspect, the light was behind me so he could see through it. I don't know what I changed into, maybe I put shorts on under it. Dennis, over and over during that camp experience, about 7 days and 6 nights, he would bring it up. He would say that he could see every bit of me, he said, "I could see your breasts, I could see your thread of pubic hair." He was constantly bringing it up, and I was dreading him bringing it up. I was horrifically embarrassed. He should have mentioned it to his wife, if I was wearing something inappropriate. But he just kept saying it to me, brought it up several times on the trip and then again years later.

Student #35 described to T&M that he would continuously mention that evening and when he did so, she felt "like he was getting his rocks off, making me have to answer as a woman, not the girl that I was."

This student reported that O'Brien did not engage in sexual contact with her until the fall of ▮▮▮▮ when she was a 16-year-old junior. She said that she began to visit O'Brien in his office after her sports team practice and that at first, they just talked. She also said that soon after the visits began, she sat on his lap and that those interactions evolved to include "French passionate" kissing, and "he would put his hand up [her] shirt, under [her] bra, unhook [her] bra, fondle [her] breasts." She reported that these interactions continued throughout her entire junior year and took place in his office, in his on-campus apartment and the wrestling room, amongst other places on the McDonogh campus. This student also stated, "While this was happening he would talk about how it was inappropriate and wrong, but also talking about, complimenting my body. It wasn't like it happened once, and he said, 'This is wrong and awful, I can't believe it's happening, never again,' and it kept happening." She also reported one occasion when O'Brien's wife was out of town and she went to his apartment where she got into bed with O'Brien and she could feel O'Brien's "erection" against her thigh or lower stomach. She reported that O'Brien did not touch her below the waist on that occasion or any others

and never called her by her proper name, rather referring to her as "princess." Student #35 told T&M that O'Brien left McDonogh at the end of that school year to focus on other work, and that when they said goodbye he informed her that after her graduation they could "finally consummate things."

She recalled that the following year when she was a senior, she disclosed O'Brien's behavior to McDonogh faculty member, Liz Hlavacek, and that Hlavacek told her "we need to tell the School." She said that she then met with Hlavacek, ███████████████ and her mother and disclosed everything that had happened between her and O'Brien.

Student #36 told T&M that in ████ during her senior year at McDonogh, O'Brien convinced her to go sailing with him and another faculty member, Cooper by telling her a "story" that all of the students that had helped O'Brien work on a boat were going "sailing together." She told T&M that at some point, she learned that the only people sailing would be O'Brien, Cooper and herself, and that she remembered Cooper was not on the boat the entire time. The student reported that while on the boat, "at some point, Dennis kissed me." She recalled that it occurred over the span of a "couple of minutes and then I stopped it," and could not recall what, if anything, he said to her after the kiss.

### 2. McDonogh was aware that O'Brien had engaged in inappropriate conduct between a teacher and student in 1980. McDonogh was aware of O'Brien's abuse of Student #35 in 1987 after his separation from the School.

The credible evidence gathered during the course of T&M's investigation supports a finding that McDonogh was aware that O'Brien had engaged in inappropriate conduct between a teacher and student with a female middle school student in 1980 and was aware of O'Brien's abuse of Student #35 in 1987.

Notably, although Student #34, did not respond to T&M's request for an interview, T&M's examination of O'Brien's personnel file indicates that allegations of inappropriate interactions between a Student #34, a female middle school student, and O'Brien were brought to the School's attention by the student's parents in ████ Specifically, a "Memorandum for the Record," dated November 3, ████ signed by Mules appears to memorialize a meeting between Mules, Burgess, Q.D. Thompson and Student #34's parents. The document indicates that the parents began the meeting by saying that they "sought no punishment in the matter they were broaching, rather they wanted [the School] to be aware of it." The document further indicates that the matter concerned "the relationship of [student # 34] and Dennis O'Brien and an incident that had taken place last summer." Former Student #34's parents explained that after discovering a letter from a friend in their daughter's bedroom asking what their daughter had done after "Denny kissed [her]" and finding a letter from O'Brien to their daughter, they confronted their daughter about her interactions with O'Brien. According to the document, Student #34 told her parents that O'Brien "had visited her at camp and, to her surprise, had kissed her," that the kiss had not been a "cordial 'hello-goodbye' kiss on the cheek," and that Student #34 "'got away' as fast as she could 'without running.'" The memo also indicates that the student's parents said their

daughter had already put the incident aside but recognized it as "improper." Student #34's parents asked in the meeting that O'Brien be made aware of their knowledge of both the letter and of the kissing incident. Later in the memo, there is an indication that Burgess had some concerns about how O'Brien "was acting, in groups, with [Student #34]" but does not provide any additional detail about the specific nature of the concerns or when they first came to Burgess' attention.

A Memorandum from Mules to the file, dated November 4, ██████ indicates that when Mules, Thompson, Burgess and O'Brien met to discuss Student #34, O'Brien reportedly conveyed that Student #34 had a "crush" on him, and that "he has been concerned – for the past year – about [student's] inappropriate attachment to him and to other middle school faculty." The memo further indicates that Mules responded that "the kissing and the letter" could be interpreted as either "a clumsy effort" on O'Brien's part at "handling the affection" of Student #34 or alternatively, "an indication of totally unacceptable seductive activities" on his part, and that Mules would consider terminating his contract if there was "cause for concern."

A confidential memo from Burgess to O'Brien's personnel file, dated November 10, ██████ indicates that in response to the allegations, there were multiple meetings between members of the McDonogh administration and O'Brien regarding the alleged inappropriate contact with Student #34, that O'Brien was "extremely upset" and "shocked" that the School had not supported his "good intentions," and that he believed that at McDonogh "crushes were not to be discouraged." The memo further conveys that Burgess felt O'Brien was at best "naïve" and at worst "potentially destructive." Burgess also indicated that he spoke with another faculty member, Patti Hoffman, about the situation involving O'Brien and Student #34 and that she felt the student was reacting in a "steady, mature way to an unsettling experience," and that she believed if O'Brien "did more to discourage the crushes of young girls," she believed he would be a "positive influence."

A Memorandum for the Record from Mules, dated November 12, ██████ indicates that Mules spoke with Student #34's father and that Mules believed O'Brien's action had been "naïve and not evil," that McDonogh was "disappointed that Mr. O'Brien had failed to heed our warnings when they were given last spring," that they would continue to keep a "close eye upon this matter," and "would not tolerate any inappropriate behavior on the part of Mr. O'Brien." Notably, there was no evidence gathered during the investigation to indicate the context or content of the warning previously given to O'Brien.

T&M's examination of other documents in O'Brien's personnel file support the conclusion that O'Brien left McDonogh in 1986, as a result of concern about an exam he had given, whether he had lied to students, and whether his focus had remained on teaching throughout the previous semesters.

As previously noted, McDonogh became aware of O'Brien's sexual interactions with Student #35 in 1987 after O'Brien left McDonogh. Student #35 disclosed O'Brien's behavior to McDonogh faculty member, Liz Hlavacek, and Hlavacek told her "we need to tell the School." The student then met with Hlavacek, ██████ ██████ and her mother and disclosed everything that had happened between her and O'Brien. Student #35's mother, a McDonogh faculty member at the time, reported to T&M that she became aware of the

physical "relationship" between her daughter and O'Brien in ▮▮▮ when two administrators, Liz Hlavacek and ▮▮▮▮▮▮▮▮ informed her that her daughter had disclosed O'Brien's sexual behavior to Hlavacek. Her mother also told T&M that she spoke with Mules about O'Brien and her daughter, who encouraged her to confront O'Brien directly. She said that the information "was kept quiet" for the sake of her daughter but that she was "sure" Mules had spoken with law enforcement, but that O'Brien had not been arrested as she and her daughter "didn't press charges." She further reported that she believed "[O'Brien] was not allowed to work with young people" after that. Student# 35 told T&M that she never spoke directly with Mules nor with law enforcement about what O'Brien had done to her. Moreover, there was no evidence gathered during the investigation to indicate whether law enforcement was informed of what transpired.

## E. Daniel Roach

1. **Former McDonogh faculty member Daniel Roach engaged in repeated acts of sexual contact, including sexual intercourse and oral sex, with a 17-year-old female McDonogh student in the 1980s.**

The credible evidence gathered during the course of T&M's investigation supports a finding that Daniel Roach ("Roach"), a McDonogh art teacher and Chair of the art department from 1980-1989,[26] engaged in repeated acts of sexual contact, including sexual intercourse, oral sex, and kissing, with Student #36 during the spring of 1985 while she was a 17-year-old senior and that such sexual contact continued with this student until she was a junior year in college.

Student #36 told T&M that Roach was her art teacher and possibly her soccer coach, and that she became "infatuated" with him and developed "a huge crush on him" during her senior year at McDonogh. She explained that she spent "lots of extra time in the art room, taking classes but also talking to him in his office there" and further recalled playing tennis with him "outside of school" on at least one occasion. Student #36 explained that during that period of time, Roach informed her he was separating from his wife and said to her, "I want you to know, it's not because of you." She told T&M, "That was the first time anything was referenced that anything was going on." She also reported that it was around this time that she asked Roach to be her advisor on an externship. Student #36 said that at some point towards the end of her senior year, she and Roach "started talking about how [they] were feeling about each other, and at some point toward the very end of senior year, [they] went out one night, that was how the physical relationship started." Student #36 explained that the sexual intercourse and oral sex began after she and Roach started spending more time together and discussing the way they felt about each other but that there had been previous physical interactions that included "kissing, light kissing or fooling around" when they would meet off campus. Student #36 said that she and

---

[26] During the course of its investigation, T&M examined the contents of Roach's personnel file which included a signed State of Connecticut Department of Education Recommendation Form, dated March 11, 1991, filled out by the Associate Head of McDonogh indicating that Roach had been employed by McDonogh from September 1980 through June 1989.

Roach later had sexual interactions, including intercourse and oral sex, at Roach's apartment on campus and at a hotel off campus. She told T&M that their physical and sexual relationship continued into her junior year of college when she "finally" ended it because she "wasn't in love with him anymore."

In addition, Student #36 told T&M that she did not report her sexual interactions with Roach to anyone at McDonogh while she was a student. She further stated that she told her parents about her relationship with Roach after her freshman year in college, by which point she had turned 18, but did not disclose to them that the relationship began when she was a student at McDonogh. [27] She said she disclosed that information to them approximately 10 years later.

> **2. One McDonogh faculty member may have been aware of Roach's inappropriate interactions with Student #36 when she was a McDonogh student. One McDonogh faculty member was aware of the relationship between Student #36 and Roach when the student was in college and McDonogh's Headmaster heard rumors about that relationship after the student's graduation from McDonogh.**

Although Student #36 indicated that she did not report Roach's conduct to anyone at McDonogh while she was a student, she told T&M that she believed former faculty member Dennis O'Brien was aware of it. She explained that she had a conversation with O'Brien while she was a student during which she believed O'Brien "asked" her about her relationship with Roach and that while she "didn't give him any details," she "didn't deny it." She said that she also then told Roach that O'Brien "knew" about them.

Student #36 also reported that former faculty member Rob Staugaitis ("Staugaitis") was also aware of a relationship between her and Roach after her graduation from McDonogh, possibly during her freshman year of college. She explained that she returned to campus to have dinner at Roach's apartment with Roach, Staugaitis, and Student #37 with whom Staugaitis was having a "romantic relationship." Student #36 reported that Staugaitis "obviously knew I was there," but also said, "I don't know if he knew when our relationship started."

Moreover, T&M's review of Roach's personnel file[28] indicates that McDonogh had some information after Student #36's graduation about a relationship between Student #36 and Roach. A "Confidential Memo to file" from Headmaster Mules, dated April 30, 1987, indicates that a meeting took place on that day between Mules and Roach during which Roach's "relationship" with Student #36 was discussed. Specifically, the memo indicates that the School had heard "again" "from a parent" about "concerns over [Roach's] relationship" with Student #36 and references another memorandum, dated September 22, 1986, about information previously brought to Mules' attention. [29] Mules also wrote, "The timing of Dan's separation from his wife and Dan's

---

[27] Although T&M requested to speak with Student #36's mother, Student #36 told T&M that her mother is currently suffering from a brain tumor as well as memory loss and would probably be "hazy" in relaying any information. As a result, T&M determined that an interview would not be requested.

[28] On May 5, 2017 T&M received Roach's personnel file, with an attached copy of a separate file labeled "confidential."

[29] The memorandum, dated Sept. 22, 1986, was not found in Roach's personnel file.

friendship with [the student ] is the one reason why such concerns might arise on the part of Dan." Mules' memo further indicates that he told Roach that he met with Roach because "it was customary for us to speak directly to the person(s) involved whenever we heard reports or rumors of some concern," and informed Roach that "although [he] had no reason to believe that this matter was more than a persistent, unsubstantiated rumor, if it were otherwise, we could not tolerate having a faculty member involved, romantically, with students." The memo indicates that Roach became angry and that this anger was "tempered" when he told Mules "that there was no basis for concern." The last line of Mules' memo reads: "We ended the conference in a polite manner, with me accepting Dan's statement of innocence." There was no evidence gathered during the investigation to suggest that Mules or anyone else in a position of authority at McDonogh spoke to Student #36 about her relationship with Roach while she was a student or at any point after her graduation.

Roach continued to teach at McDonogh until June of 1989.